*Malik Small v. State of Maryland*, No. 19, September Term, 2018. Opinion by Greene, J.

**CRIMINAL LAW – CRIMINAL PROCEDURE – EYEWITNESS IDENTIFICATION – PHOTO ARRAY**

The Court of Appeals reviewed the long-standing *Manson-Jones* framework, which is the proper test for assessing the admissibility of evidence of an extrajudicial identification procedure that is challenged on due process grounds. Applying the *Manson-Jones* test to the present case, the Court determined that the second of two photo array identification procedures, through which the victim identified Petitioner in a photo as the perpetrator of the crime, was suggestive. It was suggestive because Petitioner's photo was emphasized during the first photo array, and then Petitioner was the only person from the first array who was repeated in the second array. Nonetheless, the victim's identification had sufficient indicia of reliability, under the totality of the circumstances, to overcome the taint of that suggestion. Therefore, whether or not the identification was reliable was ultimately a question for the jury. Petitioner's motion to suppress evidence of the pretrial identification on due process grounds was properly denied. The Court of Special Appeals' judgment, which affirmed the Circuit Court for Baltimore City's ruling on Petitioner's motion to suppress, is affirmed.

IN THE COURT OF APPEALS

OF MARYLAND

No. 19

September Term, 2018

_____

MALIK SMALL

v.

STATE OF MARYLAND

_____

Barbera, C.J.
Greene,
*Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Opinion by Greene, J.
Barbera, C.J, McDonald, J. and Adkins, J.,
concur.

_____

Filed: June 24, 2019

*Adkins, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the MD. Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Ordinarily, the reliability of relevant evidence is a matter committed to the province of the jury. There may, however, be a reliability question concerning evidence of eyewitness identifications challenged on due process grounds. In such cases, the court will review an identification's reliability in the first instance if law enforcement procured the identification utilizing suggestive procedures. The matter before this Court concerns such a due process reliability inquiry.

Petitioner Malik Small ("Petitioner" or "Mr. Small") alleges that evidence of an out-of-court identification procedure, through which the victim of an assault identified Petitioner as the perpetrator of the crime, should have been suppressed because it violated his right to due process of law. We begin by reviewing and reaffirming the well-settled test for assessing the admissibility of evidence of extrajudicial eyewitness identifications. Applying that test to the facts of this case, we conclude that the challenged identification contained sufficient indicia of reliability to overcome the suggestive nature of the pretrial identification procedures. Therefore, we shall affirm the judgment of the Court of Special Appeals.

## FACTUAL & PROCEDURAL BACKGROUND

On June 17, 2015, a man tried to rob, and ultimately shot, Ellis Lee ("Mr. Lee") at a bus stop in Baltimore City. Following the incident, the Baltimore City Police Department administered two photo arrays to Mr. Lee, which resulted in his identification of Petitioner Malik Small as the assailant. The State charged Mr. Small with a 10-count indictment in the Circuit Court for Baltimore City. Before the matter proceeded to trial, Mr. Small moved to suppress evidence of the two extrajudicial photographic array identification procedures.

On March 18, 2016, the Circuit Court for Baltimore City held a suppression hearing to assess the admissibility of evidence of the identification procedures.

*The Suppression Hearing*

At the outset, the suppression court ruled that evidence of the first photo array could not be admitted by the State against Mr. Small at his trial.[1]  The State and Mr. Small's counsel were, however, permitted to produce evidence of the first array during the suppression hearing in order to provide context for the second photo array.  The hearing proceeded on the question of whether the second photo array would be admissible in evidence at Mr. Small's trial.

During the hearing, Mr. Lee recalled the incident that occurred on June 17, 2015. He testified that, at 2:00 a.m., he was sitting at a bus stop on Northern Parkway in Baltimore City looking at his cell phone when a man approached him.  The man stood approximately one foot away from Mr. Lee, pointing a gun at Mr. Lee and covering the bottom portion of his face with a white T-shirt.  The man said, "Let me get your money."  Mr. Lee emptied his pockets and told the man that he did not have any money.  The man said, "Run, bitch," so Mr. Lee ran away.  As Mr. Lee fled, the man fired the gun, and one bullet struck the back of Mr. Lee's right leg.  Mr. Lee made it to Gittings Avenue where he was met by an ambulance that transported him to the emergency room at Johns Hopkins Hospital.

While describing the incident during the suppression hearing, Mr. Lee testified that

---

[1] The court suppressed evidence of the first photo array because Detective Stanley Ottey, the detective who administered the first photo array, was not available to testify at the suppression hearing.  The parties do not challenge the suppression court's ruling, suppressing evidence of the first photo array.

he noticed the gun before he saw the face of the man holding it. The assailant, Mr. Lee said, was covering the bottom portion of his face up to his nose with a white T-shirt, but his neck was exposed. Mr. Lee recalled that it was dark outside, but there was a very dark orange street light shining on the man, which made it "kind of easier to see him." His interaction with the assailant, Mr. Lee estimated, lasted "two minutes at most."

At the hospital, Mr. Lee was interviewed by three detectives, including Detective Matthew DiSimone, the lead investigator on the case. Detective DiSimone testified that Mr. Lee described the assailant as "a black male, light skin, believed he had seen him before, a light [T]-shirt, tattoo on the right side of his neck, 5'8", regular sized, a short haircut. He held the bottom of his shirt up over his face, blue jeans, block letter tattoo on neck, had letter 'M' in it." Mr. Lee believed he had seen the assailant twice before the incident at Staples, where Mr. Lee worked, because he recognized the assailant's voice and tattoo. Mr. Lee did not describe their interactions at Staples, and he did not know the assailant by name.

After Mr. Lee was released from the hospital, Detective DiSimone and Mr. Lee revisited the scene of the crime. Then, they drove to the Northern Police District. According to Detective DiSimone, Mr. Lee gave another description of the assailant at the police station. Mr. Lee described the assailant as "a light brown, black male, 5'8", regular sized, with a scraggly beard, a tattoo on his neck." He also described the tattoo "in detail," as being "[b]lock styled cursive script, bold, not dull, containing multiple letters and at least one of them was an 'M.'"

Detective DiSimone used a police database to compile mugshots to be included in

3

a "photo array identification procedure."[2]  To compile the array, he searched for men with light brown complexions and beards, who were between 5'6" and 5'8".  He did not look for men with neck tattoos.  Ultimately, the first array included six pictures – Petitioner's photo and five filler photos.[3]  Detective DiSimone included one front-facing photo of each person in the first array in order to keep the tattoo out of view.  "[He] felt that the tattoo was described in so much detail that it would be leading if [he] put the tattoo in the picture."  Despite Detective DiSimone's intentions, the "M" tattooed on Petitioner's neck was plainly visible in Petitioner's photograph.[4]  Petitioner was the only person depicted in the first array who had a visible neck tattoo.

After compiling the array, Detective DiSimone printed the six photographs and array instructions, which were to be read to Mr. Lee.  He gave the photos and instructions to Detective Stanley Ottey, the administrator for the first photo array.  A blind procedure[5] was used to administer the first photo array.  Detective Ottey was not involved in the

---

[2] A photo array identification procedure occurs when "an array of photographs, including a photograph of a suspect and additional photographs of other persons not suspected of the offense, is displayed to an eyewitness in hard copy form or by computer for the purpose of determining whether the eyewitness identifies the suspect as the perpetrator."  Md. Code Ann., Public Safety § 3-506.1(a)(8) (2003, 2018 Repl. Vol.) ("PS").

[3] A filler, in the context of a photo array, is "a photograph of a person who is not suspected of an offense and is included in an identification procedure."  PS § 3-506.1(a)(6).

[4] This fact is apparent from viewing the first array, the photographs for which were collectively admitted into evidence during the suppression hearing.

[5] A blind procedure "means the administrator [i.e. the person conducting the procedure] does not know the identity of the suspect."  PS § 3-506.1(a)(3).

investigation, and neither Detective Ottey nor Mr. Lee was advised of the identity of the suspect. Detective Ottey administered the first photo array at 8:37 a.m. During the procedure, Detective Ottey made notes about Mr. Lee's statements. In reference to Petitioner's photo, Detective Ottey wrote that Mr. Lee said he "looks like [the assailant], doesn't think it's him."

Mr. Lee testified that during the first array, "[he] picked out one who kind of looked like [the assailant], but [he] wasn't too sure." He remembered seeing "[t]he tattoo on the neck, [he] just related the two . . . it look[ed] pretty much like the same tat[too] [he] saw [during the incident]." Yet, Mr. Lee explained that the assailant was covering his face during the incident, so Mr. Lee said, "I'm not going to give you 100 percent of somebody's life in my control . . . . I gave him in terms of 80 percent sure." The parties stipulated to the fact that Mr. Lee could not make a positive identification during the first array.

After the first array, Mr. Lee gave another statement to Detective DiSimone. Then, Detective DiSimone compiled the second photo array. Detective DiSimone believed that "if a second array was shown containing side profile pictures, which gave a view of the tattoo, it might assist in . . . identification." To compile the second array, Detective DiSimone searched for photos of men with light brown skin and a beard. This time, he also looked for photos of men with a tattoo on their neck. He explained that the database had a small selection of individuals with neck tattoos, so he did not specifically look for tattoos with letters. Ultimately, the second array included twelve pictures – two photos[6]

---

[6] One photo showed the person facing front, and the other photo showed his right profile.

each of six individuals. Petitioner was included with five new fillers, making Petitioner the only individual from the first array who was repeated in the second array.[7] All of the fillers in the second array had a tattoo on their neck.[8] In addition to Petitioner, at least one filler had a tattoo that contained letters. None of the fillers had a tattoo with the letter "M" in it.

The second array was administered by Sergeant Detective Ethan Newberg using a blind procedure. Sergeant Newberg was not involved in the investigation, and he did not know who the suspect was. Likewise, Mr. Lee was not advised whom law enforcement suspected was the assailant. Sergeant Newberg conducted the procedure at approximately 11:45 a.m. in an office where only he and Mr. Lee were present. Sergeant Newberg explained that he read Mr. Lee a set of array instructions, then he showed Mr. Lee all twelve photographs. During the procedure, Sergeant Newberg made notes of Mr. Lee's statements. In reference to Petitioner's photo, Sergeant Newberg testified that, according to his notes, Mr. Lee said, "That's him. That's who shot me."

Mr. Lee testified that before the second array, he was told that he was being shown more photos "to make sure this was the same person." Additionally, he only remembered

---

[7] A different photo of Petitioner was used in the second array than the first array. In both photos, Petitioner is depicted with practically the same facial expression, facial hair, neck tattoo, and skin tone. In the first array, Petitioner was depicted wearing a white T-shirt and looking directly at the camera. In the second array, Petitioner was depicted wearing a black T-shirt overtop of a gray T-shirt and looking slightly downward. Petitioner's hair also appears slightly longer in the second array.

[8] This fact is apparent from viewing the photographs in the second array, which were collectively admitted into evidence during the suppression hearing.

seeing Petitioner's photograph during the second array.[9] Mr. Lee went on to explain that although the assailant was covering his face, "the characters [Mr. Lee] saw on his neck and what [Mr. Lee] saw on the picture . . . matched."

On Petitioner's photo, Mr. Lee wrote, "This is the same tattoo and face I remember robbing me and the man I remember shooting me. I also remember him from coming into my job [at Staples] on two different occasions." Mr. Lee said that when he identified Petitioner as the assailant, he was 100% sure of his identification. Mr. Lee was confident in his identification because when he saw the tattoo, "[i]t was almost like a rush of memory from both Staples and what [he] remembered seeing that night."

Mr. Lee testified that two weeks later, he saw a man on a dirt bike whom he believed was the assailant. Mr. Lee had already been told that Mr. Small was arrested, but he called the police to report the man he saw. In response, Mr. Lee recalled being told, "That can't be true. We already have the guy . . . he's already confessed to it. You're fine."[10]

---

[9] We interpret Mr. Lee's testimony to mean that he did not remember seeing the filler photos, not that Mr. Lee was only shown Mr. Small's photo during the second array. When summarizing the facts of this case, neither Mr. Small nor the State posited that Mr. Lee was only shown Mr. Small's photos during the second array. Rather, Mr. Small stated that Mr. Lee "did not recall seeing any other photos in the second photo array, save for the photos of Mr. Small. *However, the second array contained ten other photos*." (emphasis added). Moreover, we must view the facts in the light most favorable to the State. *McFarlin v. State*, 409 Md. 391, 403, 975 A.2d 862, 869 (2009). Therefore, we proceed with the understanding that Mr. Lee was, in fact, shown all twelve photos of all six individuals during the second photo array, but at the time of the suppression hearing he did not remember seeing the filler photos.

[10] Mr. Small did not confess to the crime. Detective DiSimone and Sergeant Newberg were not aware of anyone from the Baltimore City Police Department telling Mr. Lee that Mr. Small confessed to the crime.

Sometime after June 17, 2015, Mr. Lee spoke with an Assistant State's Attorney about his identification. During that conversation, Mr. Lee indicated that he was 70% sure about his identification. Mr. Lee could not articulate what caused his confidence level to decrease.

At the conclusion of the suppression hearing, the presiding judge ruled that the second photo array was admissible. To reach this conclusion, the judge first considered whether the array was suggestive. She did not find it problematic that the individuals in the second photo array did not share the same tattoo or all have letters in their tattoos. The judge explained that it is not reasonable to expect the police to find similar-looking people who also have similar tattoos. The judge did, however, take issue with the timing of the first and second arrays. She explained:

> My problem is with the timing, with the fact that they showed [Mr. Lee] a picture of [Mr. Small] at 8:30 in the morning . . . [Mr. Lee] says, "I'm not sure that's the guy," and then they show him another photo array . . . approximately three hours later, and the only person that's repeated in the second photo array is [Mr. Small]. That's troubling.

Nevertheless, the judge concluded that the second photo array was admissible because she found it reliable by clear and convincing evidence. She reasoned that "[Mr. Lee] knew who [Mr. Small] was. [Mr. Lee] had already seen him twice before. [Mr. Lee] recognized his voice. It had nothing to do with the photograph." Therefore, the suppression court denied Mr. Small's motion to suppress the second photo array.

*The Trial and Verdict*

The matter proceeded to trial before a jury in the Circuit Court for Baltimore City.

Ultimately, the jury found Mr. Small guilty of attempted robbery, second-degree assault, and reckless endangerment. Mr. Small was sentenced to eight years of incarceration. Mr. Small noted an appeal to the Court of Special Appeals.

*The Court of Special Appeals*

On appeal, the Court of Special Appeals reviewed, *inter alia*, the suppression hearing court's ruling, denying Mr. Small's motion to suppress the second photo array. *Small v. State*, 235 Md. App. 648, 668-91, 180 A.3d 163, 174-89 (2018). The intermediate appellate court reviewed Maryland and United States Supreme Court caselaw regarding due process challenges to extrajudicial identifications. *Id*. As to the merits of Petitioner's due process claim, the court first concluded that the second array was suggestive. *Id*. at 680, 180 A.3d at 176-84. Yet, the court determined that the identification had sufficient indicia of reliability to overcome the procedure's suggestiveness. *Id*. at 683-91, 180 A.3d at 184-89. Therefore, the Court of Special Appeals affirmed the suppression hearing court's denial of Mr. Small's motion to suppress evidence of the second photo array. *Id*. at 691, 180 A.3d at 189.

Mr. Small petitioned this Court for a writ of certiorari. We granted the petition on June 1, 2018. *Small v. State*, 459 Md. 399, 187 A.3d 35 (2018). The issue now before this Court is whether the suppression court properly denied Petitioner's motion to suppress.[11]

---

[11] The question presented, as framed by Petitioner, is: Did the Court of Special Appeals err in holding that the pretrial identification of Petitioner, which the Court determined to be the product of an impermissibly suggestive procedure, was reliable?

## PARTIES' ARGUMENTS

Petitioner contends that the suppression hearing court erred in denying his motion to suppress evidence of the second photo array because the identification procedure violated his right to due process of law. Petitioner challenges the Court of Special Appeals' reliability analysis. Petitioner posits that the court erred in concluding that the identification was reliable and admissible.

Respondent, the State of Maryland, argues that the suppression hearing court properly admitted, and the Court of Special Appeals properly affirmed admission of, evidence of Mr. Lee's extrajudicial identification. According to Respondent, both courts properly analyzed the identification's reliability and therefore properly denied Petitioner's motion to suppress.

Also before this Court is the brief submitted by *amici curiae*.[12] *Amici* challenge the framework that Maryland courts apply for assessing due process challenges to pretrial identifications, which was articulated by the United States Supreme Court in *Manson v. Brathwaite*[13] and adopted by this Court in *Jones v. State*.[14] *Amici* contend that this framework does not adequately assess an identification's reliability, and that we should revise this framework as, according to *amici*, many of our sister states have done.

---

[12] Before this Court as *amici curiae* are the Innocence Project, Inc. and the University of Baltimore Innocence Project Clinic.

[13] 432 U.S. 98, 97 S. Ct. 2243, 53 L.Ed.2d 140 (1977).

[14] 310 Md. 569, 530 A.2d 743 (1987), *cert. granted, judgment vacated on other grounds*, 486 U.S. 1050-51, 108 S. Ct. 2815, 100 L.Ed.2d 916 (1988), *conviction aff'd, sentence vacated and remanded*, 314 Md. 111, 549 A.2d 17 (1988).

## DUE PROCESS CHALLENGES TO EXTRAJUDICIAL IDENTIFICATION PROCEDURES

The right to due process of law is guaranteed by the Fifth Amendment and Fourteenth Amendment to the United States Constitution and Article 24 of the Maryland Declaration of Rights. *Webster v. State*, 299 Md. 581, 599, 474 A.2d 1305, 1314 (1984). "Due process protects the accused against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures." *Jones*, 310 Md. at 577, 530 A.2d at 747 (quoting *Moore v. Illinois*, 434 U.S. 220, 227, 98 S. Ct. 458, 464, 54 L.Ed.2d 424 (1977)). When an accused challenges the admissibility of an extrajudicial identification procedure[15] on due process grounds, Maryland courts assess its admissibility using a two-step inquiry. *Id*. The inquiry, in essence, seeks to determine whether the challenged identification procedure was so suggestive that the identification was unreliable. "[R]eliability is the linchpin[.]" *Manson*, 432 U.S. at 114, 97 S. Ct. at 2252, 53 L.Ed.2d 140.

In step one of the due process inquiry, the suppression court must evaluate whether the identification procedure was suggestive. *Jones*, 310 Md. at 577, 530 A.2d at 747. The defendant bears the burden of making a *prima facie* showing of suggestiveness. *See Smiley v. State*, 442 Md. 168, 180, 111 A.3d 43, 50 (2015).

If the court determines that the extrajudicial identification procedure was not

---

[15] An extrajudicial identification procedure is one that is made outside of the courtroom. *Webster v. State*, 299 Md. 581, 589-90, 474 A.2d 1305, 1309 (1984). By contrast, a judicial or in-court identification occurs when the witness identifies the accused inside of the courtroom. *Id*.

11

suggestive, then the inquiry ends and evidence of the procedure is admissible at trial. *Jones*, 310 Md. at 577, 530 A.2d at 747. If the court determines that the identification procedure was tainted by suggestiveness, then evidence of the identification is not *per se* excluded. *Id.; Perry v. New Hampshire*, 565 U.S. 228, 232, 132 S. Ct. 716, 720, 181 L.Ed.2d 694 (2012) ("An identification infected by improper police influence, our case law holds, is not automatically excluded."). Rather, the suppression court must proceed to the second stage of the due process inquiry. *Jones*, 310 Md. at 577, 530 A.2d at 747.

In step two of the due process inquiry, the suppression court must weigh whether, under the totality of the circumstances, the identification was reliable. *Id*. At this stage, the burden rests with the State to show that the identification was reliable by clear and convincing evidence. *Smiley*, 442 Md. at 180, 111 A.3d at 50. The United States Supreme Court and this Court have previously identified five factors that may be used to assess reliability. The factors include the witness's opportunity to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's description of the criminal, the witness's level of certainty in his or her identification, and the length of time between the crime and the identification. *Jones*, 310 Md. at 577-78, 530 A.2d at 747 (citation omitted); *Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S. Ct. 375, 382, 34 L.Ed.2d 401 (1972). Ultimately, the court must determine whether the identification is admissible by "weigh[ing] the reliability of the identification against the 'corrupting effect' of the suggestiveness." *Jones*, 310 Md. at 578, 530 A.2d at 747 (citation omitted).

*Amici* urge us to abandon this legal framework and endorse a revised approach that is consistent with the New Jersey Supreme Court's decision in *State v. Henderson*, 27 A.3d

12

872 (N.J. 2011). In *Henderson*, the New Jersey Supreme Court undertook an extensive

review of a court-appointed special master's recommendations about the factors that many

experts believe impact a witness's ability to identify the perpetrator of a crime. *Id*. Based

on these recommendations, the court delineated a list of factors that trial courts may

consider when assessing suggestiveness and reliability.[16]  *Id*. at 920-21. In addition, the

---

[16] The court explained that system variables should be explored when analyzing suggestiveness. *State v. Henderson*, 27 A.3d 872, 920 (N.J. 2011). System variables are factors "which are within the control of the criminal justice system." *Id*. at 895. For instance, the person administering the array should not know the suspect's identity. *Id*. at 896-97, 920. The witness should be instructed that the suspect may or may not be in the array. *Id*. at 897, 920. The array should include at least five fillers who resemble the suspect. *Id*. at 898, 920. The witness should not be given feedback, or shown a suspect or filler multiple times. *Id*. at 899-00, 920. The witness's level of confidence should be recorded promptly, and an inquiry should be made into whether the witness spoke with anyone about the identification. *Id*. at 920-21. The witness may have initially made no identification or a different identification during an identification procedure. *Id*. at 921. *Id*. Lastly, the court cautioned that showups are inherently suggestive. *Id*. at 903.

The court explained that, when analyzing reliability, courts should consider estimator variables. *Id*. at 921. Estimator variables are factors "over which the legal system has no control." *Id*. at 895. For instance, the witness's level of stress may impact reliability. *Id*. at 904, 921. In addition, facts about the encounter may affect reliability, such as the presence of a weapon, lighting, duration, and distance between the witness and the perpetrator. *Id*. at 904-06, 921. Characteristics of the witness and perpetrator may be pertinent, such as the witness's level of intoxication and if the perpetrator was wearing a mask. *Id*. at 906-07, 921. The court said that the amount of time between the crime and the identification may impact reliability. *Id*. at 907, 922. It explained that cross-racial identifications may be less reliable. *Id*. at 907. Finally, the court noted that many estimator variables overlap with the five *Biggers* reliability factors, and it included the five factors in its non-exhaustive list of estimator variables that may be used to evaluate reliability. *Id*. at 921-22.

13

court revised the *Manson* framework.[17]

The case at bar is not this Court's first opportunity to review Maryland's *Manson-Jones* framework in light of the New Jersey Supreme Court's decision in *Henderson*. *See Smiley*, 442 Md. at 184, 111 A.3d at 52. In *Smiley*, we had the opportunity to adopt New Jersey's framework for assessing the admissibility of eyewitness identifications, but we did not do so. *Id*. "We decline[d] to do so, because this Court, as well as the Court of Special Appeals, have consistently reaffirmed application of the procedure in [] *Jones* for examining challenges to the admissibility of eyewitness identifications." *Id*. Consistent with our decision in *Smiley*, we decline the invitation to abandon the *Manson-Jones*

---

[17] Under the revised *Henderson* approach, first the defendant bears the burden of setting forth some evidence, tied to a system variable, that indicates suggestiveness. 27 A.3d 827, 920 (2011). Second, the State must show that the eyewitness identification is reliable, accounting for system and estimator variables. *Id*. Consistent with *Manson*, the ultimate burden "remains on the defendant to prove a very substantial likelihood of irreparable misidentification." *Id*. (citing *Manson*, 432 U.S. at 116, 97 S. Ct. at 2254, 53 L.Ed.2d at 155) (citation omitted). The court should suppress the identification if the totality of the circumstances indicate "a very substantial likelihood of irreparable misidentification[.]" *Id*.

It appears that, under *Henderson*'s revised framework, reliability factors become relevant earlier in the court's inquiry. *See id*. at 919 (explaining that "the revised framework should allow all relevant system *and* estimator variables to be explored and weighed at pretrial hearings when there is some actual evidence of suggestiveness[.]"). Under *Manson*'s framework, the court must conclude that the defendant made a *prima facie* showing of suggestiveness before reliability factors become relevant. *Smiley v. State*, 442 Md. 168, 180, 111 A.3d 43, 50 (2015); *see also Webster v. State*, 299 Md. 581, 620, 474 A.2d 1305, 1325 (1984) (concluding that because the "lineup was not one whit suggestive" reliability was not at issue). Under *Henderson*, as long as the defendant produces some evidence of suggestiveness, then the court explores all relevant indicators of suggestiveness and reliability in order to determine whether there is a very substantial likelihood of irreparable misidentification. 27 A.3d at 919.

framework, which Maryland courts use, and have used for decades, to assess due process challenges to extrajudicial identification procedures.[18]  The reliability inquiry remains to be whether, under the totality of the circumstances, the challenged identification was reliable, despite the suggestiveness in the identification procedure.

The focus of the reliability assessment is on the totality of the circumstances, and such an inquiry is necessarily a comprehensive one.  Suppression courts can and ought to consider the myriad of facts and circumstances presented by a particular case, which may impact the identification's reliability.  *Wood v. State*, 196 Md. App. 146, 162, 7 A.3d 1115, 1124 (2010) ("A reliability appraisal . . . is extremely fact-specific.  It is a multi-factored determination that, with the help of guidelines, looks to the totality of the circumstances.").  The court's assessment should be guided by the circumstances before it.  In addition to the five *Biggers*[19] reliability factors, the suppression court may find that the factors identified

---

[18] Additionally, we disagree with *amici*'s contention that the Maryland General Assembly's 2014 amendment to PS § 3-506 counsels in favor of abandoning the *Manson-Jones* framework.  Through § 3-506, the Legislature imposed procedural requirements upon law enforcement agencies, applicable when conducting eyewitness identification procedures.  *See generally* PS §§ 3-506 and 3-506.1.  *See also* Dep't. Legis. Servs., Fiscal and Policy Note Revised, House Bill 1200 (2014 Sess.) (describing the changes as being procedural in nature).  The Legislature recognized that the statute affords defendants the ability to challenge identifications on statutory grounds, in addition to due process grounds.  *Id*.  *Amici* correctly note that in the statute's legislative history, the Legislature referenced the New Jersey Supreme Court's decision in *Henderson*.  *Id*.  So too, however, did the General Assembly reference the United States Supreme Court's decision in *Perry v. New Hampshire*.  *Id*.  In *Perry*, the Supreme Court reaffirmed that *Manson* is the appropriate test to apply when assessing due process challenges to eyewitness identifications.  565 U.S. 228, 232, 132 S. Ct. 716, 720, 181 L.Ed.2d 694 (2012).  Thus, we find no basis for discerning a legislative intent to dismantle our long-standing due process jurisprudence.

[19] 409 U.S. 188, 93 S. Ct. 375, 34 L.Ed.2d 401 (1972).

in *Henderson*, many of which overlap with the *Biggers* factors, and other factors are relevant to the court's evaluation.[20] *See, e.g.*, *United States v. Greene*, 704 F.3d 298, 308-10 (4th Cir. 2013) (applying the *Henderson* variables in conjunction with the five *Biggers* factors).   Therefore, although we do not revise this Court's jurisprudence for assessing the admissibility of eyewitness identifications, we do recognize the breadth that is inherent in an inquiry that hinges upon the totality of the circumstances.[21]   Having established the appropriate test for analyzing Petitioner's due process challenge, we now apply the aforementioned principles to the facts of this case.

## STANDARD OF REVIEW

Upon reviewing a suppression hearing court's decision to grant or deny a motion to suppress, we limit ourselves to considering the record of the suppression hearing. *McFarlin v. State*, 409 Md. 391, 403, 975 A.2d 862, 868-69 (2009).   We accept the

---

[20] To the extent that expert testimony is required to explain how a particular circumstance may have impacted the eyewitness's identification, the admissibility of the expert's testimony is governed by Maryland Rule 5-702. *Smiley*, 442 Md. at 184, 111 A.3d at 52-53 (2015) ("[I]f expert testimony regarding an eyewitness identification is offered, its admissibility is governed by Maryland Rule 5-702 and *Bomas v. State*, 412 Md. 392, 987 A.2d 98 (2010)).

[21] To be sure, we are not, as the Concurring Opinion suggests, "dismiss[ing] decades of extensive social science research[.]" *Small v. State*, No. 19, 2018 Term, slip op. at 1 (Concurring Opinion, Barbera, C.J.).   Rather, to the extent that there is an ambiguity in Maryland law, we are clarifying that courts analyzing the suggestiveness and reliability of an eyewitness identification should consider any system and estimator variables that are relevant under the circumstances of a particular case.   Which variables, if any, are relevant under the circumstances will, of course, depend in all cases upon the evidence that the parties place on the record during the adversarial proceeding.   As such, we acknowledge that the *Manson-Jones* framework is sufficiently flexible to account for the current state of, and even future developments in, social science research.

suppression hearing court's factual findings and determinations regarding the credibility of testimony unless they are clearly erroneous. *Id*. at 403, 975 A.2d 869. Findings cannot be clearly erroneous "[i]f there is any competent material evidence to support the factual findings of the trial court[.]" *YIVO Institute for Jewish Research v. Zaleski*, 386 Md. 654, 663, 874 A.2d 411, 416 (2005). The evidence and inferences reasonably drawn therefrom are viewed in the light most favorable to the prevailing party. *McFarlin*, 209 Md. at 403, 975 A.2d at 869. Legal conclusions are reviewed *de novo*. *Id*. We independently apply the law to the facts to determine whether a defendant's constitutional rights have been violated. *Id*.

## DISCUSSION

### A. Suggestiveness

First, we review whether Petitioner made a *prima facie* showing that the second photo array procedure was suggestive. Before this Court, the parties agree that the procedure was suggestive. Nonetheless, we conduct our own constitutional evaluation of the array in order to provide guidance primarily to Maryland courts and law enforcement.

An identification procedure is properly deemed suggestive when the police "[i]n effect . . . repeatedly sa[y] to the witness, '*This* is the man.'" *Jones*, 310 Md. at 577, 530 A.2d at 747 (citing *Foster v. California*, 394 U.S. 440, 443, 89 S. Ct. 1127, 22 L.Ed.2d 402 (1969)). The impropriety of suggestive police misconduct is in giving the witness a clue about which photograph the police believe the witness should identify as the perpetrator during the procedure. *See Conyers v. State*, 115 Md. App. 114, 121, 691 A.2d 802, 806 (1997), *cert. denied*, 346 Md. 371, 697 A.2d 111 (1997) ("The sin is to contaminate the

17

test by slipping the answer to the testee." (emphasis omitted)).

In the context of a photographic array, the array's composition may, for instance, signal to the witness which photo to select. *Smiley*, 442 Md. at 180, 111 A.3d at 50 (citations omitted). This Court has said that the composition of a photo array "to be fair need not be composed of clones." *Id*. at 181, 111 A.3d at 50 (citations omitted). Though, the individuals in the array should resemble each other. *Webster*, 299 Md. 581, 620, 474 A.2d 1305, 1325 (1984). Concerns may arise when one individual's photograph is shown to a witness multiple times or somehow stands out from the other photos in the array. *Simmons v. United States*, 390 U.S. 377, 383-94, 88 S. Ct. 967, 971, 19 L.Ed.2d 1247 (1968) (explaining that if a witness sees "the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized . . . the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen[.]").

This Court has not had occasion to address whether depicting an individual's tattoo in a photo array may render the array suggestive. The Court of Special Appeals has, however. *See, e.g.*, *Sallie v. State*, 24 Md. App. 468, 332 A.2d 316 (1975). In *Sallie*, an eyewitness to a robbery described one of the robbers as having a diamond-shaped mark on his right cheek. *Id*. at 470, 332 A.2d at 317. Law enforcement showed the eyewitness a photo array, in which Louis Sallie was depicted with a diamond-shaped mark on his cheek. *Id*. at 471, 332 A.2d at 318. The witness identified Mr. Sallie as the perpetrator, at least in part because of the mark. *Id*. On appeal, Mr. Sallie argued the photo array was suggestive because he was the only person pictured with a diamond-shaped mark on his

18

right cheek. *Id*. at 472, 332 A.2d at 318. Based on the alleged suggestiveness in the photo array, Mr. Sallie argued that the eyewitness's in-court identification of Mr. Sallie was tainted and, thus, inadmissible. *Id*.

The court reviewed the photo array for suggestiveness. *Id*. Although the court determined that the mark was a unique identifying feature, the court explained:

> Every individual is unique. The mouth, the lips, the teeth, the chin, the cheeks, the nose, the eyes, the forehead, the ears, the hair, or any combination of two or more of those and other features, make every individual unique. They make him different from all others. They are the basis upon which any person is visually distinguished from other persons. The more subtle the distinctions, the more difficult the identification, and the greater potential for error.

*Id*. at 472, 332 A.2d at 318. The court reasoned that the burglar's distinctive mark could have exonerated Mr. Sallie, but it implicated him because the burglar and Mr. Sallie both had the unique mark. *Id*. The mark, therefore, made the identification not only "inevitable" but also more reliable. *Id.* Ultimately, the Court of Special Appeals concluded that, despite the fact that Mr. Sallie was pictured with his unique identifying mark, the photo array was not suggestive. *Id*. at 472, 332 A.2d at 318.

Additionally, the Court of Special Appeals has reviewed whether repeating an individual's picture may render a photo array suggestive. *See, e.g.*, *Morales v. State*, 219 Md. App. 1, 98 A.3d 1032 (2014). In *Morales*, Luis Morales argued that the identification procedure, through which he was identified as the perpetrator of a crime, was impermissibly suggestive. *Id*. at 17-18, 98 A.3d at 1042. His argument rested upon the fact that he was the only person included in both of the two identification procedures

19

administered to the witnesses. *Id.* The court determined that there was no reason to believe that the witnesses noticed that Mr. Morales's photo was repeated. *Id.* at 18, 98 A.3d at 1042. The police used a more recent photo of Mr. Morales in the second procedure than the first procedure. *Id.* In addition, nothing that the witnesses said indicated that they chose Mr. Morales's photograph because they had seen it before. *Id.* at 18, 98 A.3d at 1043. Therefore, the court concluded that the identification procedure was not suggestive. *Id.* at 19, 98 A.3d at 1043.

In the present case, Petitioner's photo was emphasized during the first photo array. Petitioner was the only person in the first array who had a tattoo visible on his neck. Petitioner's tattoo was prominently visible, and it clearly depicted a cursive-script "M." Our determination that Petitioner's photo was emphasized is also evidenced by the fact that Detective DiSimone recognized that to depict Petitioner's conspicuous tattoo in the first array would draw attention to his photo. Detective DiSimone testified "that the tattoo was described in so much detail that it would be leading if [he] put the tattoo in the picture" during the first array. Despite the tattoo's presence, unlike in *Sallie*, Mr. Lee was only 80% positive that Petitioner was the assailant after viewing the first array.

After Petitioner's photo was emphasized in the first photo array, his photo recurred in the second array. Unlike in *Morales*, Mr. Lee had reason to notice that Petitioner was repeated in the second array. Petitioner was the only person from the first array with an "M" tattoo, and then the only person from the first array who was repeated in the second array. Although Petitioner was not the only person in the second array with a tattoo on his neck, he was, again, the only person with the letter "M" tattooed on his neck. The implicit

20

suggestion inherent in repeating Petitioner's photo with his distinct tattoo is also bolstered by the fact that Mr. Lee recalled being told that the second array was "to make sure this was the same person," after Mr. Lee said that Petitioner "looked like" the assailant as depicted in the first array.

Similar to *Morales*, however, law enforcement used a different photo of Petitioner in the second array than in the first array. Additionally, nothing that Mr. Lee said indicated that he chose Petitioner's photograph in the second array because he saw it in the first array. To the contrary, at the suppression hearing, Mr. Lee testified that he identified Petitioner because he recognized Petitioner's tattoo from the incident and Staples, not from the first array. The fact that Mr. Lee may not have been susceptible to the suggestive procedure does not absolve this procedure of its suggestive elements. By emphasizing Petitioner's photo in the first array, and then repeating Petitioner's photo in the second array, law enforcement implicitly suggested to Mr. Lee that he should identify Petitioner as the assailant. *See Simmons*, 390 U.S. at 383, 88 S. Ct. at 971, 19 L.Ed.2d 1247. Therefore, we conclude that the second photo array was unduly suggestive.

### B. Reliability

Having concluded that the second photo array was suggestive, we move to the second step of the due process inquiry. At this stage, the suppression court must screen the identification's reliability to determine "[i]f there is 'a very substantial likelihood of irreparable misidentification.'" *Perry v. New Hampshire*, 565 U.S. 228, 232, 132 S. Ct. 716, 720, 181 L.Ed.2d 694 (2012) (citation omitted). The State bears the burden of proving reliability by clear and convincing evidence. *Morales*, 219 Md. App. at 14, 98 A.3d at

21

1040.

When assessing an identification's reliability, among the factors that the suppression court may consider are:

> (i) the opportunity of the witness to view the criminal at the time of the crime;
> (ii) the witness' degree of attention;
> (iii) the accuracy of the witness' prior description of the criminal;
> (iv) the level of certainty demonstrated by the witness at the confrontation; and
> (v) the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S. Ct. 375, 382, 34 L.Ed.2d 401 (1972). The critical inquiry is "whether under the 'totality of the circumstances' the identification is reliable even though the confrontation procedure was suggestive." *Webster*, 299 Md. at 601, 474 A.2d at 1315 (citing *Biggers*, 409 U.S. at 198, 93 S. Ct. at 382) (citations omitted). As this articulation suggests, the identification's reliability must be weighed in light of the procedure's suggestiveness.

A suppression court assessing an identification's reliability must be mindful of the fact that reliability is not a ground upon which the accused may argue for exclusion. The issue of reliability is "by diametric contrast, a severe limitation on such exclusion." *Conyers*, 115 Md. App. at 120, 691 A.2d at 805. It provides the State with a means to show that the identification has sufficient indicia of reliability to warrant admitting it into evidence for the jury, the ultimate arbiter of reliability, to consider. *See Wood v. State*, 196 Md. App. 146, 162, 7 A.3d 1115, 1124 (2010) ("[R]eliability is quintessentially a jury question and an evidentiary issue," and "it is not a catalyst for suppression but an antidote

22

thereto."). Thus, where a procedure's suggestiveness creates a very substantial likelihood that the witness misidentified the culprit, evidence of the identification must be suppressed in order to preserve the accused's right to due process of law. *Perry*, 565 U.S. at 239, 132 S. Ct. at 724-25, 181 L.Ed.2d 694. Where, however, "the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." *Id.* at 232, 132 S. Ct. at 721, 181 L.Ed.2d 694.

In *Manson v. Brathwaite*, the Supreme Court concluded that there was no substantial likelihood that the eyewitness misidentified the culprit, even though the identification was procured by showing the eyewitness one photograph. 432 U.S. 98, 116, 97 S. Ct. 2243, 2254, 53 L.Ed.2d 140 (1977). There, the eyewitness stood at the perpetrator's door for two to three minutes, and the door opened twice. *Id.* The eyewitness spoke to the perpetrator, and it was not dark outside. *Id.* The eyewitness was a trained police officer, not a casual observer. *Id.* He gave a description of the perpetrator within minutes of the incident, which described the perpetrator's race, height, build, hair color and style, high cheek bones, and clothes. *Id.* The eyewitness saw the photograph two days after the confrontation, and he was positive about his identification. *Id.*

In *Biggers*, the Supreme Court concluded that evidence of a victim's identification, which was made at a suggestive showup procedure, was admissible because there was no substantial likelihood of misidentification. 409 U.S. at 201, 93 S. Ct. at 383, 34 L.Ed.2d 401. There, the victim spent thirty minutes with the assailant under artificial light and moonlight. *Id.* at 200, 93 S. Ct. at 382. The victim's description was "more than ordinarily

23

thorough," as it included the assailant's age, height, weight, complexion, skin texture, build, and voice. *Id.* She was confident in her identification. *Id.* at 201, 93 S. Ct. at 383. Additionally, the witness was the victim of the crime, not a casual observer. *Id.* at 200, 93 S. Ct. at 382-83. Lastly, although the identification was made seven months after the crime, the victim only made one identification during the multiple showups she viewed. *Id.* at 201, 93 S. Ct. at 383.

Under the facts of this case, the suppression court and the Court of Special Appeals concluded that there was clear and convincing evidence that Mr. Lee's identification of Petitioner was reliable. The suppression court reached this conclusion based on Mr. Lee and Petitioner's prior familiarity. The Court of Special Appeals rested its holding on Mr. Lee's prior familiarity with Petitioner. Exercising its independent authority, the court also considered a multitude of other reliability factors. We review the factors that both courts considered to establish reliability.

*Prior Familiarity*

First, the suppression court found that Mr. Lee had prior familiarity with Petitioner, so the identification "had nothing to do with the photograph [Mr. Lee saw during the first array]." The Court of Special Appeals also determined that their prior familiarity bolstered the identification's reliability.

Based on the record, Mr. Lee told Detective DiSimone at the hospital that he "believed he had seen [the assailant] before." Mr. Lee elaborated that he had seen the assailant at Staples, where Mr. Lee was employed, on two occasions. Mr. Lee did not provide specifics about the nature of these encounters, and he did not know the assailant

24

by name. Still, immediately after identifying Petitioner as the assailant, Mr. Lee wrote on Petitioner's photo that he "remember[ed] [Petitioner] from coming into my job [at Staples] on two different occasions." Additionally, Mr. Lee testified that he was confident in his identification because when he saw Petitioner's tattoo in the second array, it "was almost like a rush of memory from both Staples and what [he] remembered seeing that night [during the incident]."

Petitioner argues that for prior acquaintanceship to bolster the reliability of an identification, we must require a higher degree of prior familiarity between the eyewitness and the alleged perpetrator. Petitioner's argument invites the imposition of an arbitrary acquaintanceship requirement, which we are not willing to adopt. When a witness claims to recognize an assailant from a prior encounter, the credibility of the witness's statement is a factual matter. In this case, the suppression court chose to credit Mr. Lee's testimony that he recognized the assailant, and that the recognition aided him in making an identification. That Mr. Lee did not know the assailant by name or provide details about the prior encounters may detract from the weight that the jury ultimately assigns Mr. Lee's testimony. It does not render the suppression court's factual finding of prior familiarity clearly erroneous. Therefore, affording due deference to the suppression court's decision to credit Mr. Lee's testimony and finding of prior familiarity, we conclude that the fact that Mr. Lee recognized the assailant from encounters preceding the incident weighs in favor of reliability.

*Opportunity to View*

Next, we review Mr. Lee's opportunity to view the assailant at the time of the crime. In the case at bar, there is no challenge to the accuracy of Mr. Lee's description of the assailant or the opportunity or ability for Mr. Lee to formulate the description he gave to police. The undisputed facts indicate that Mr. Lee's encounter with the assailant lasted approximately two minutes. During that time, Mr. Lee and the assailant were close together, only separated by about one foot, and Mr. Lee spoke with the assailant. As Petitioner points out, it was dark outside during the incident at 2:00 a.m., and the only lighting was a "dark orange" colored street light. Yet, Mr. Lee testified that the street light was shining directly on the assailant, which made it easier for Mr. Lee to see him. In addition, Petitioner notes that the assailant was covering the bottom portion of his face with a white T-shirt. Despite the partial obstruction, Mr. Lee was still able to see the uncovered portions of the assailant's face, hair, and neck, and describe the assailant's skin tone, beard, hair, and neck tattoo. Viewing these facts in the light most favorable to the State, we conclude, as did the Court of Special Appeals, that Mr. Lee's opportunity to view the assailant weighs in favor of reliability.

*Degree of Attention*

In addition, we review Mr. Lee's degree of attention during the encounter. Mr. Lee stood approximately one foot away from the assailant. He spoke with the assailant when he explained that he did not have any money. Mr. Lee was the victim of the crime, not a "casual or passing observer." *See Webster*, 299 Md. at 621 (determining that because the witnesses were subjected to threats during the robbery, their degree of attention was

26

"intense."). Additionally, he was sufficiently attentive to notice and recall the assailant's skin tone, hair, facial hair, and neck tattoo.

Petitioner contends that Mr. Lee's degree of attention cannot weigh in favor of reliability because the assailant had a gun during the encounter. *See Henderson*, 27 A.3d at 904-05 (explaining that the presence of a weapon during a short encounter can impact the reliability of a witness's ability to reliably identify and describe the perpetrator). Indeed, weapon-focus may be a circumstance that suppression courts consider within their reliability assessment. *See, e.g.*, *U.S. v. Greene*, 704 F.3d 298, 308 (4th Cir. 2013) (explaining that the eyewitness had a gun pointed at her, which weighed against the reliability of her testimony). In order to conclude that weapon-focus impaired Mr. Lee's identification and description of the assailant, we would need facts from which we could infer that the weapon distracted Mr. Lee. Mr. Lee testified that "[he] saw the gun first before [he] saw the guy connected." At best, we can discern that Mr. Lee saw the gun first, but in addition to, the person holding it. Viewing the facts in the light most favorable to the State, Mr. Lee's proximity to the crime and the details that he observed about the assailant indicate that he was attentive during the crime. We conclude that Mr. Lee's degree of attention weighs in favor of reliability.

*Accuracy of Prior Descriptions*

We also review the accuracy of Mr. Lee's prior descriptions of the assailant. At the hospital, Mr. Lee described the assailant as "[a] black male, light skin, believed he had seen him before, a light [T]-shirt, tattoo on the right side of his neck, 5'8", regular sized, a short haircut. He held the bottom of his shirt up over his face, blue jeans, block letter tattoo on

27

neck, had a letter 'M' in it." Neither party contends that the attributes in this initial description inaccurately describe Petitioner. Notably, Mr. Lee's description includes more than just general qualities that could illustrate the features of an innumerable number of people. In particular, Mr. Lee described the block letter "M" tattoo at the hospital. Accordingly, from the outset, Mr. Lee's description of the assailant described Petitioner with considerable specificity.

Petitioner argues that Mr. Lee's description of the assailant's tattoo changed after he viewed Petitioner's photo in the first array, and that this demonstrates the corrupting impact of the first photo array. Specifically, Petitioner contends that Mr. Lee first described the assailant's tattoo as being in cursive script after the first array, whereas Respondent argues that this detail emerged before the first array. At the suppression hearing, Detective DiSimone was asked what information he had about the assailant's tattoo to rely on when compiling the first array. Detective DiSimone consulted his notes, and he said, "Block styled cursive script, bold, not dull, containing multiple letters and at least one of them was an 'M' was the description that was provided." There was some confusion, however, as to when Detective DiSimone recorded the notes that he consulted. Viewing Detective DiSimone's testimony in the light most favorable to the State, regardless of when the detective made those notes, when he compiled the first array he apparently knew that the assailant's tattoo included a cursive script "M."

Moreover, in the detailed description of the assailant's tattoo, Mr. Lee also said that the assailant's tattoo had "multiple letters" in it. This description is consistent with Petitioner's profile-view photo in the second array, in which the letters "L," "Y," and "M"

28

are seen tattooed on Petitioner's neck. We also observe that only the letter "M" is visible in the first array. The letters "L" and "Y" cannot be seen, and it is not observable from the first array that Petitioner's tattoo contains additional letters. Therefore, Mr. Lee could not have discerned this detail from the first array. Viewing the facts in the light most favorable to the State, because Detective DiSimone said that the detailed description of the tattoo was provided before the first array, and because the fact that Petitioner's tattoo contained multiple letters is not discernable from the first array, we cannot conclude that the first array corrupted Mr. Lee's description of the assailant. We conclude that Mr. Lee's description of the assailant weighs in favor of reliability.

*Level of Certainty*

Additionally, we consider Mr. Lee's level of certainty. Mr. Lee's level of certainty undisputedly wavered. During the first photo array, Mr. Lee said that Petitioner's photo looked like the assailant, but he was only 80% sure of his claim. Then, three hours later, Mr. Lee saw Petitioner's photo again, and he identified Petitioner as the assailant. This time, Mr. Lee was 100% sure of his identification. Mr. Lee questioned his identification two weeks later when he thought he saw the assailant on a dirt bike, even though he knew Petitioner had been arrested. Mr. Lee's level of confidence decreased sometime subsequent to June 17, 2015, when Mr. Lee told an Assistant State's Attorney that he was 70% sure of his identification of Petitioner. At the suppression hearing, Mr. Lee could not explain why his confidence level varied. We conclude, as did the Court of Special Appeals,

29

that Mr. Lee's wavering level of certainty does not weigh in favor of reliability.

*Lapse in Time*

Next, we must consider the length of time between the crime and the display of the photo array. The attempted robbery occurred at 2:00 a.m. on June 17, 2015. The presentation of the second array occurred at approximately 11:45 a.m. on June 17, 2015. Approximately ten hours lapsed between the crime and the display of the photo array.[22]

Within that time frame, Mr. Lee also viewed the first array. Although Petitioner's photo was emphasized in the first array, and then repeated three hours later in the second array, Mr. Lee never indicated that the first array impacted his identification. To the contrary, Mr. Lee connected his identification to his memory of the incident, ten hours earlier, and his prior encounters with the assailant at Staples. For instance, Mr. Lee wrote on Petitioner's photograph, "This is the same tattoo and face I remember robbing me and the man I remember shooting me. I also remember him from coming into my job [at Staples] on two different occasions." He also explained that he was confident in his identification because seeing Petitioner's tattoo in the second array was "like a rush of

---

[22] Petitioner contends that the identification is not reliable because Mr. Lee may have been administered drugs while he was in the hospital. *See Henderson*, 27 A.3d at 906 (explaining that a witness's level of intoxication may affect the reliability of an identification). In appropriate cases, the influence of drugs or alcohol may impact the reliability of an identification. Here, Mr. Lee did not recall being given any drugs at the hospital. Mr. Lee testified, "They gave me . . . saline to re-hydrate myself and I asked for hours can I have something to take care of the pain because it increased and I don't even remember them coming in. The only thing I remember them giving me was just the saline." Petitioner did not introduce any evidence at the suppression hearing indicating that Mr. Lee was under the influence of drugs at the hospital. Therefore, this factor is inapplicable to the present case.

memory from both Staples and what [he] remembered seeing that night." We conclude

that the lapse in time between the crime and the confrontation weighs in favor of reliability.

*Petitioner's Neck Tattoo*[23]

Finally, the Court of Special Appeals reviewed the presence of Petitioner's neck

tattoo as an independent factor impacting the identification's reliability. In its discussion,

the court explained that the assailant's tattoo was distinctive to Mr. Lee and served as an

identifying feature. Channeling the logic from *Sallie*, the court concluded that because the

assailant and Petitioner both had the tattoo, Mr. Lee's identification of Petitioner was

"inevitable indeed, but also . . . more rather than less reliable." *Small*, 235 Md. App. 648,

691, 180 A.3d 163, 188 (2018) (quoting *Sallie*, 24 Md. App. at 472, 332 A.2d at 318).

We agree with the Court of Special Appeals that, for Mr. Lee, the tattoo was a

distinct, identifying feature of the assailant. Following the attempted robbery, Mr. Lee

described the assailant's tattoo to law enforcement in detail. Furthermore, Mr. Lee testified

that he was confident in his ultimate identification of Petitioner because of "the tattoo

---

[23] Petitioner argues that the Court of Special Appeals gave "double weight" to Mr. Lee's prior familiarity with the assailant and "triple weight" to Mr. Lee's description of the tattoo because the court weighed these facts in its analysis for multiple reliability factors. The court mentioned Mr. Lee's prior familiarity with the assailant in its analysis of Mr. Lee's prior description of the assailant, and also as an independent factor favoring reliability. In addition, the court discussed the tattoo in its analysis of Mr. Lee's opportunity to view the assailant, the accuracy of Mr. Lee's description, and as an independent factor favoring reliability. We reject Petitioner's claim that the court gave undue weight to Mr. Lee's prior familiarity with the assailant and description of the tattoo. The court appropriately considered the totality of the circumstances. Clearly, one fact may give rise to multiple inferences. *See Manson*, 432 U.S at 115, 97 S. Ct. at 2253, 53 L.Ed.2d 140 (The Court considered the timing of the eyewitness's description and the identification within the analysis of two separate *Biggers* factors).

specifically."

The Court of Special Appeals, however, viewed the second array in isolation. We do not overlook the fact that part of Petitioner's tattoo was displayed in the first photo array, nor that Mr. Lee was not 100% certain that the person in the photo was the assailant. Nonetheless, we observe that the second array portrayed more information about Petitioner's tattoo than the first array. The first array included one front-facing photo of Petitioner, depicting the "M" in Petitioner's tattoo. In addition to a front-facing photo of Petitioner, the second array included a profile-view photo of Petitioner, depicting Petitioner's full "LYM" tattoo.

We discern from these facts that Mr. Lee was apparently not susceptible to the suggestion inherent in depicting the "M" in Petitioner's neck tattoo in the first array because Mr. Lee did not make a positive identification during the first array. Mr. Lee noted that Petitioner's tattoo "look[ed] pretty much like the same tat[too] he saw [during the incident]." He was, however, only 80% sure about his identification. Mr. Lee made an identification with 100% certainty after he viewed the second array. Petitioner's photo appeared in the first array and in the second array. Yet, Mr. Lee did not indicate that he chose Petitioner's photo because his photo was repeated in the second array. Mr. Lee made an identification and explained his level of confidence because of "the tattoo specifically." Notably, the tattoo appeared in full in the second array. Additionally, Petitioner consistently tied his memories of the tattoo to his encounters with the assailant at Staples and the attempted robbery. Viewing the facts in the light most favorable to the State, we conclude that the tattoo was distinctive to Mr. Lee, and it aided his identification of

32

Petitioner as the assailant. Thus, this factor weighs in favor of reliability.

## CONCLUSION

Having conducted an independent evaluation of the identification made by Mr. Lee in light of Petitioner's right to due process of law, we cannot say that Mr. Lee's identification of the assailant was unreliable. Although there was a risk that, by emphasizing Petitioner in the first array and then repeating Petitioner's photograph in the second array, law enforcement guided Mr. Lee to identify Petitioner as the assailant, that risk is diminished by the identification's indicia of reliability. Specifically, Mr. Lee had previously encountered the assailant at Staples, and had ample opportunity to view the assailant at the time of the attempted robbery. Mr. Lee gave a specific and detailed description of the assailant. He identified his assailant shortly after the crime and was aided in making that identification because the assailant displayed a unique tattoo. Accordingly, we conclude that Respondent presented clear and convincing evidence that Mr. Lee's identification was reliable, even in light of the suggestive extrajudicial procedure.[24]

---

[24] Lastly, Petitioner argues that the Court of Special Appeals failed to weigh the identification's reliability against its indicia of suggestiveness, which Petitioner argues is particularly prejudicial in this case because Mr. Lee's identification was the only evidence presented by the State to link Mr. Small to the crime. In *Manson v. Brathwaite*, the Supreme Court declined to consider, in its due process inquiry, extraneous evidence of the defendant's guilt. 432 U.S. 98, 116, 97 S. Ct. 2243, 2254, 53 L.Ed.2d 140 (1977) ("Although it plays no part in our analysis, all this assurance as to the reliability of the identification is hardly undermined by the fact[] that respondent was arrested" where the incident took place and visited there frequently). Furthermore, our review of the present case is limited to the suppression hearing record. *McFarlin v. State*, 409 Md. 391, 403, 975 A.2d 862, 868-69 (2009). We do not review the record of the trial. *Id.* Therefore, any evidence, or lack thereof, of the defendant's guilt that was adduced at trial does not factor into our due process inquiry.

Beyond that, the weight of the identification was a matter for the jury to resolve.

We hold that the *Manson-Jones* framework continues to be the proper test for analyzing the admissibility of evidence of extrajudicial identification procedures. Applying that test to the facts of this case, we conclude that the second photo array procedure was suggestive. The identification, however, had sufficient indicia of reliability to overcome the taint of that suggestiveness. Thus, we hold that the suppression court properly denied Petitioner's motion to suppress evidence of the second photo array.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT TO BE PAID BY PETITIONER.**

Circuit Court for Baltimore City
Case No. 115191006
Argued: October 10, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 19

September Term, 2018

_____

MALIK SMALL

v.

STATE OF MARYLAND

_____

Barbera, C.J.
Greene,
*Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Concurring Opinion by Barbera, C.J., which
Adkins and McDonald, JJ., join.

_____

Filed: June 24, 2019

*Adkins, J., now retired, participated in the
hearing and conference of this case while an
active member of this Court; after being
recalled pursuant to the Md. Constitution,
Article IV, Section 3A, she also participated
in the decision and adoption of this opinion.

I join the Court's judgment because I am satisfied that the Court properly applied the current framework for reliability of eyewitness identification set forth by the Supreme Court in *Manson v. Brathwaite*, 432 U.S. 98 (1977), and adopted by this Court in *Jones v. State*.[1]  I write separately to express my disappointment in the Court's unwillingness to consider seriously, and act upon, the research that currently informs the many "vagaries of eyewitness identification."  *United States v. Wade*, 388 U.S. 218, 228 (1967).

 With its continued adherence to the test in the present case, the Court has effectively dismissed decades of extensive social science research, summarized not only in the brief of Amici, The Innocence Project, Inc. and the University of Baltimore Innocence Project Clinic, but also in a growing number of state supreme court decisions.  My colleagues acknowledge the research and note the attention the New Jersey Supreme Court has paid to eyewitness identification evidence in *State v. Henderson*, 27 A.3d 872 (N.J. 2011).  *See Small v. State*, No. 19, 2018 Term, slip op. at 12-13 & nn.16-17.  But, in the end, the Court brushes the research aside and retreats to a lock-step application of the *Manson* test, the soundness of which has since been called into serious question.

 In doing so, the Court has missed an opportunity to join the growing number of state supreme courts that recognize and are reacting to the serious due process concerns attending eyewitness identifications.  We should follow the path blazed by our sister supreme courts and act upon the research.  We should *not* persist in wholesale reliance on an archaic test based on seemingly logical assumptions that have since been refuted.

---

[1]  310 Md. 569 (1987), *cert. granted, judgment vacated on other grounds*, 486 U.S. 1050 (1988), *conviction aff'd, sentence vacated and remanded*, 314 Md. 111 (1988).

*The Supreme Court's formulation of the test for identification reliability*

In *Foster v. California*, the Supreme Court held, for the first and only time, that a police procedure was "'so unnecessarily suggestive and conducive to irreparable mistaken identification'" and, consequently, "so undermined the reliability of the eyewitness identification as to violate" the Due Process Clause of the Fourteenth Amendment. 394 U.S. 440, 442, 443 (1969) (citation omitted).

Three years later, in *Neil v. Biggers*, the Supreme Court clarified that when a police procedure is challenged as unduly suggestive—thereby calling into question whether the procedure violated due process—"the primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.'" 409 U.S. 188, 198 (1972) (citation omitted). The *Biggers* Court concluded that even when a police procedure is deemed unduly suggestive, the resultant identification could still be offered into evidence at trial so long as the identification itself was reliable. *Id*. at 201 (reasoning that the witness's "unusual opportunity to observe and identify her assailant" during the crime made the identification reliable).

To assist in determining reliability, the *Biggers* Court identified five factors: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated . . . at the confrontation, and the . . . time between the crime and the confrontation." *Id.* at 199-200. Then, in *Manson*, emphasizing that "reliability is the linchpin in determining the admissibility of identification testimony," 432 U.S. at 114, the Supreme Court held that the courts should apply the five *Biggers* factors, viewed in light

2

of the totality of the circumstances, *id.* at 110, 116. For much of the intervening time, state courts across the country, including those in Maryland, have followed the reliability test announced in *Biggers*, refined in *Manson*, and, without alteration, applied by the Supreme Court most recently in *Perry v. New Hampshire*, 565 U.S. 228 (2012).

*Social science advances since the 1970s and the New Jersey Supreme Court's landmark decision*

Since *Manson* was decided, a substantial body of social science research has challenged the validity of the *Manson* test. I will not attempt to catalog that research, but there is a general consensus that misidentification is the single greatest cause of wrongful convictions in this country. The data shows that, before 2011, "more than seventy-five percent of convictions overturned due to DNA evidence involved eyewitness misidentification," and that "[i]n half of the cases, eyewitness testimony was not corroborated by confessions, forensic science, or informants." *State v. Henderson*, 27 A.3d 872, 886 (N.J. 2011) (citations omitted); *see also* Brandon L. Garrett, *Convicting the Innocent: Where Criminal Prosecutions Go Wrong* 48-49 (2011) (finding that of the first 250 DNA exonerations, 76% of the defendants had been misidentified); *id.* at 50 (finding that witnesses choose fillers, i.e., non-suspects used to fill out lineups, in 30% of all identifications).[2] Further, a 2006 publication by the International Association of Chiefs of

---

[2]   Later studies confirm the role of mistaken identifications in falsely convicting defendants. *See* Kaitlin Jackson & Samuel Gross, Nat'l Registry of Exonerations, *Tainted Identifications* (Sept. 22, 2016), https://perma.cc/9ZZN-RG6X (finding unintentional misidentifications, i.e., those without witnesses' lying about the perpetrator or even that a crime took place, contributed to 30% (572) of the 1,886 exonerations nationwide); Innocence Project, *Eyewitness Identification Reform*, https://perma.cc/Z2VD-TAPH

(continued . . . )

Police concluded that "[o]f all investigative procedures employed by the police in criminal cases, probably none is less reliable than the eyewitness identification. Erroneous identifications create more injustice and cause more suffering to innocent persons than perhaps any other aspect of police work." *Id.* at 885-86 (quoting Int'l Ass'n of Chiefs of Police, Training Key No. 600, Eyewitness Identification 5 (2006)).

The rapidly expanding body of social science research exposes the frailty of the *Manson* factors for eyewitness identification reliability. In the words of Amici in the present case, the *Manson* test "fails to protect against unreliable eyewitness identifications because it focuses on factors that have a weak or no correlation with reliability while ignoring those that are scientifically proven to impact the reliability of eyewitness identifications." Brief of Innocence Project, Inc., et al. as Amici Curiae Supporting Petitioner at 6.

In large part, the New Jersey Supreme Court, in *Henderson*, led the way in departing from long-held judicial assumptions. After oral argument in 2009, the court "appointed a Special Master to evaluate scientific and other evidence about eyewitness identifications. [He] . . . probed testimony by seven experts and produced more than 2,000 pages of transcripts along with hundreds of scientific studies." *Henderson*, 27 A.3d at 877. The court adopted much of the "extensive and very fine report." *Id.*

The Special Master's research on scientific advances regarding the formation,

---

( . . . continued)
(finding approximately 71% of the more than 360 convictions overturned by DNA evidence nationwide involved mistaken identification).

4

storage, and recall of memory reveals a sea change in the factual underpinnings of eyewitness reliability. We should be dismayed that the assumptions of the Supreme Court justices in 1972, however well-intended, still govern the way we in 2019 decide whether an identification is reliable. For example, as the New Jersey Supreme Court observed in *Henderson*, we now know far more about memory than we did in the 1970s:

> During the 1970s, when the Supreme Court decided *Manson*, researchers conducted some experiments on the malleability[3] of human memory. But according to expert testimony, *that decade produced only four published articles in psychology literature containing the words "eyewitness" and "identity" in their abstracts*. By contrast, the Special Master estimated that *more than two thousand studies related to eyewitness identification have been published in the past thirty years*.

27 A.3d at 892 (emphasis added). Judicial procedures, the Special Master's report stated, must account for the fact that a "witness does not perceive all that a videotape would disclose, but rather 'get[s] the gist of things and constructs a 'memory' on 'bits of information . . . and what seems plausible,'" and that memory can therefore be "distorted, contaminated and even falsely imagined." *Id.* at 894.

The *Henderson* court's framework for addressing identification evidence recognizes a far more comprehensive list of suggestiveness and reliability factors than that devised from whole cloth in the 1970s. Based on the research, these factors fall into one of two categories, system variables and estimator variables. System variables are factors "within the State's control," *id.* at 896, including:

- whether a lineup was "administered in double-blind or blind fashion," *id.*;
- whether pre-identification instructions specified "that the suspect may or may

---

3 "Malleability" refers to the extent to which "an array of variables can affect and dilute memory and lead to misidentifications." *State v. Henderson*, 27 A.3d 872, 895 (N.J. 2011).

5

not be in the lineup or array and that the witness should not feel compelled to make an identification," *id.* at 897;

- whether a lineup or array is properly constructed or makes a suspect stand out, *id.* at 897-98;
- whether post-identification feedback or confirmation "signal[s] to eyewitnesses that they correctly identified the suspect," thus "engender[ing] a false sense of confidence in a witness," *id.* at 899;
- whether a witness had multiple viewings of the same suspect during the investigation and thus the later identification may merely "stem[] from . . . a memory of the earlier identification procedure," *id.* at 900;
- whether lineups are presented simultaneously or sequentially, *id.* at 901; and
- whether unreliable composites or suggestive showups were used, *id.* at 902-03.

Estimator variables are factors "beyond the control of the criminal justice system" and may be "related to the incident, the witness, or the perpetrator." *Id.* at 904. They include:

- the level of stress the eyewitness was under at the time of the events, *id.*;
- whether "weapon focus" may have "distract[ed] a witness and draw[n] his or her attention away from the culprit," *id.* at 904-05;
- the "amount of time an eyewitness has to observe an event," *id.* at 905;
- the distance and lighting conditions between the eyewitness and the perpetrator, *id.* at 906;
- eyewitness characteristics both temporary—like intoxication—or immutable— like age—that can affect reliability, *id.*;
- characteristics of the perpetrator that can affect reliability, such as disguises, masks, or changed facial features, *id.* at 907;
- the passage of time, as memories fade over time and "memory decay 'is irreversible,'" *id.*;
- whether the identification is "cross-racial," as that is generally more difficult, *id.*;
- whether private actors—e.g., other witnesses, newspaper accounts, or photographs—may have altered a witness's memory, *id.* at 907-08;
- the speed with which the witness makes an identification, *id.* at 909-10.

The *Henderson* court adopted a new procedure for evaluating suggestiveness and reliability incorporating these variables:

First, to obtain a pretrial hearing, a defendant has the initial burden of showing some evidence of suggestiveness that could lead to a mistaken identification. That evidence, in general, must be tied to a system—and not

an estimator—variable.

Second, the State must then offer proof to show that the proffered eyewitness identification is reliable—accounting for system and estimator variables . . . .

Third, the ultimate burden remains on the defendant to prove a very substantial likelihood of irreparable misidentification. To do so, a defendant can cross-examine eyewitnesses and police officials and present witnesses and other relevant evidence linked to system and estimator variables.

Fourth, if after weighing the evidence presented a court finds from the totality of the circumstances that [the] defendant has demonstrated a very substantial likelihood of irreparable misidentification, the court should suppress the identification evidence. If the evidence is admitted, the court should provide appropriate, tailored jury instructions . . . .

27 A.3d at 920 (footnote and citations omitted). Through the targeted consideration of new variables and its new four-part inquiry, New Jersey has ameliorated two drawbacks to the *Manson* framework: (1) it inadequately accounts for the impact of suggestiveness in the first prong on reliability in the second prong; and (2) it does not incorporate current knowledge about how the human brain functions.

Among the Special Master's findings were insights on jurors' reliance on witness certainty. The Supreme Court included, in *Biggers*, the witness's certainty as a reliability factor, albeit without citing any scientific authorities. 409 U.S. at 199. Research studies virtually unanimously indicate that, despite an eyewitness's belief that his or her identification is accurate, there is no statistically significant correlation between certainty and accuracy. *See* Nat'l Research Council, Nat'l Acads., Identifying the Culprit: Assessing Eyewitness Identification 6 (noting that the *Manson* test "treats factors such as the confidence of a witness as independent markers of reliability when, in fact, it is now well established that confidence judgments may vary over time and can be powerfully swayed by many factors").

The problem is compounded by many jurors' "*belief* that eyewitness confidence correlates with accurate identifications," Brief of Am. Psychol. Ass'n as Amicus Curiae Supporting Petitioner at 19 n.14, *Perry*, 565 U.S. 228 (No. 10-8974) ("APA Brief") (emphasis added). Also troubling are jury surveys and mock jury studies disclosing that jurors do not intuitively understand the science of memory and, unless informed on the subject, are inclined to accept the eyewitness's level of "certainty." *See State v. Guilbert*, 49 A.3d 705, 720-21 (Conn. 2012) (stating there is "near perfect scientific consensus" that "eyewitness identifications are potentially unreliable in a variety of ways unknown to the average jury").

The New Jersey Supreme Court sought to inform jurors about the potential pitfalls of seemingly certain eyewitness identifications. Noting the research, *Henderson*, 27 A.3d at 917, the court held that "jurors should be told that poorly constructed or biased lineups can affect the reliability of an identification and enhance a witness' confidence," *id.* at 899. The court thus asked New Jersey's Criminal Practice and Model Criminal Jury Charges Committees "to draft proposed revisions to the current charge on eyewitness identification" that reflect "all of the system and estimator variables . . . for which we have found scientific support that is generally accepted by experts." *Id.* at 925-26.

The *Henderson* court also permitted expert testimony "by qualified experts seeking to testify about the import and effect of certain variables" but not to "opine on the credibility of a particular eyewitness." *Id.* at 925. The court "anticipate[d], however, that with enhanced jury instructions, there will be less need for expert testimony" because jury instructions "are focused and concise, authoritative (in that juries hear them from the trial

8

judge, not a witness called by one side), and cost-free; they avoid possible confusion to jurors created by dueling experts; and they eliminate the risk of an expert invading the jury's role or opining on an eyewitness' credibility." *Id.* In the end, the court left "to the trial court the decision whether to allow expert testimony in an individual case." *Id*.

In *Perry*, the Supreme Court's latest foray into this subject, the American Psychological Association ("APA"), with both parties' consent, submitted an amicus brief urging the Supreme Court to revisit *Manson* and correct the assumptions made in that case:

> [M]ost of [the *Biggers*] factors are indeed relevant to probable accuracy—with the notable exception of witness certainty. But given that notable exception, and given the plethora of other accuracy-related factors that researchers have identified since *Biggers* and *Manson*, APA urges the Court, in an appropriate case, to revisit the *Manson* framework so as to bring it in line with current scientific knowledge.

APA Brief at 13 n.8 (citations omitted). Justice Sotomayor put an even finer point on the matter in her dissent:

> The empirical evidence demonstrates that eyewitness misidentification is "the single greatest cause of wrongful convictions in this country." Researchers have found that a staggering 76% of the first 250 convictions overturned due to DNA evidence since 1989 involved eyewitness misidentification. Study after study demonstrates that eyewitness recollections are highly susceptible to distortion by postevent information or social cues; that jurors routinely overestimate the accuracy of eyewitness identifications; that jurors place the greatest weight on eyewitness confidence in assessing identifications even though confidence is a poor gauge of accuracy; and that suggestiveness can stem from sources beyond police-orchestrated procedures.

565 U.S. at 263-64 (Sotomayor, J., dissenting) (footnotes omitted).

*Additional states' recognition of the research*

The New Jersey Supreme Court does not stand alone in recognizing the need to

progress beyond the five-factor *Manson* test, particularly the factor associated with witness certainty. Indeed, some states preceded New Jersey. *E.g.*, *State v. Long*, 721 P.2d 483, 491 (Utah 1986) ("A careful reading of [the *Biggers* factors] will show that several of the criteria listed by the Court are based on assumptions that are flatly contradicted by well-respected and essentially unchallenged empirical studies."); *Brodes v. State*, 614 S.E.2d 766, 770 (Ga. 2005) (agreeing with the *Long* decision and elaborating that "'[t]he scientific validity of the studies confirming the many weaknesses of eyewitness identification cannot be seriously questioned at this point'" and research "'ha[s] taught us much about the fallibility of eyewitness identification'"). The *Brodes* Court concluded that, given "the critical importance of accurate jury instructions as 'the lamp to guide the jury's feet in journeying through the testimony in search of a legal verdict,' we can no longer endorse an instruction authorizing jurors to consider the witness's certainty in his/her identification as a factor to be used in deciding the reliability of that identification." 614 S.E.2d at 771.

After *Henderson*, the Oregon Supreme Court conducted its own review of the research. *State v. Lawson*, 291 P.3d 673, 685-88 (Or. 2012). That court acknowledged that the "factors affecting the reliability of eyewitness identifications that we discuss are similar to those described in *Henderson*," *id.* at 685 n.3, before creating its own procedure for adjudicating suppression motions grounded in the state's evidentiary rules and naming expert testimony and jury instructions as the appropriate remedies, *id.* at 696-97. The Supreme Court of Hawaii also considered *Henderson* and took note, in particular, of New Jersey's "stringent standard" for requiring a cautionary instruction on cross-racial identification. *State v. Cabagbag*, 277 P.3d 1027, 1037 (Haw. 2012). The court held it

"cannot be assumed that juries will necessarily know how to assess the trustworthiness of eyewitness identification evidence"; therefore, "when eyewitness identification is central to the case, circuit courts must give a specific jury instruction upon the request of the defendant to focus the jury's attention on the trustworthiness of the identification." *Id.* at 1038-39. The court lamented that factfinders "continue to place great weight on the confidence expressed by the witness in assessing reliability." *Id.* at 1036.

Although in 2015, as the Court has recounted in the case at bar, we declined to adopt the New Jersey Supreme Court's findings and procedural overhaul, *Smiley v. State*, 442 Md. 168 (2015), three states have since done so. The Supreme Judicial Court of Massachusetts established its own Study Group on Eyewitness Evidence, *Commonwealth v. Gomes*, 22 N.E.3d 897, 900 n.3 (Mass. 2015), whose report often quoted from or overlapped with the *Henderson* findings. *See id.* at 911-16. The report convinced the court that some scientific principles "are 'so generally accepted'[4] that it is appropriate in the future to instruct juries" to help jurors apply those principles. *Id.* at 900. The court appended to its opinion a "provisional instruction" modeled on New Jersey's, *see id.* at 918-27 (citing *Henderson* in footnotes), to be given "until a model instruction is issued." *Id*. at 900-01. The Alaska Supreme Court conducted its own review of the research but borrowed much from *Henderson*, *Young v. State*, 374 P.3d 395, 417-25 (Alaska 2016), on its way toward requiring a procedure for trial courts that "closely follows the framework

---

4 The Massachusetts court explained at some length that whether "a principle of eyewitness identification is 'so generally accepted' that it is appropriate to incorporate into a model instruction" is determined by "the instruction's underlying purpose and the concerns it is intended to alleviate." *Commonwealth v. Gomes*, 22 N.E.3d 897, 908 (Mass. 2015).

11

set out by the Supreme Court of New Jersey in *State v. Henderson*," *id.* at 427. The court also asked the state's jury instructions committee to draft a model instruction consistent with the research. *Id.* at 428. The Connecticut Supreme Court discussed the estimator and system variables listed in *Henderson*, *State v. Harris*, 191 A.3d 119, 138-40 (Conn. 2018), along with the "persuasive precedents of other state courts," *id.* at 138, before "conclud[ing] that the most appropriate framework [for trial courts to evaluate the reliability of an identification] is that adopted by the New Jersey Supreme Court in *State v. Henderson*," *id.* at 143. Other state supreme courts have taken smaller steps.[5]

---

[5] *See, e.g.*, *Minor v. United States*, 57 A.3d 406, 413-14 (D.C. 2012) (citations omitted) (reiterating a prior holding that expert testimony about eyewitness reliability is permissible because the court had "learned much to cause us to reexamine our view that average lay persons serving as jurors are well equipped to call upon their common sense" to assess the credibility of eyewitness identification testimony); *State v. Almaraz*, 301 P.3d 242, 252-53, 258 (Idaho 2013) (reiterating the *Manson* two-step but adopting *Henderson* in instructing that system variables should be considered in the suggestiveness prong and that estimator variables "serve to elaborate on this Court's five-factor test for reliability," and allowing for expert testimony to address suggestive police practices); *State v. Reid*, 186 P.3d 713, 729 (Kan. 2008) (confirming the court's "refinement" of the *Biggers* model by its use of eight factors for excluding an eyewitness identification); *State v. Mahmoud*, 147 A.3d 833, 839 (Me. 2016) ("In light of the voluminous body of scientific research that has emerged regarding the reliability of eyewitness identification, and the subsequent evolving trend among both state and federal courts to instruct juries on this matter, we conclude that it is permissible, where relevant, to instruct jurors on the reliability of eyewitness identification."); *People v. Marshall*, 45 N.E.3d 954, 960 (N.Y. 2015) (requiring *per se* suppression of a pretrial identification if procedure is unduly suggestive); *People v. Boone*, 91 N.E.3d 1194 (N.Y. 2017) (requiring an instruction, in relevant cases, on cross-racial identification reliability); *Commonwealth v. Walker*, 92 A.3d 766, 789 (Pa. 2014) ("Thus, we observe that the potential fallibility of eyewitness identification is 'beyond [the knowledge] possessed by the average layperson,' indeed, may be counterintuitive, and so conclude that expert testimony on that subject could potentially assist the trier of fact to understand . . . the factors which potentially impact eyewitness testimony."); *State v. Copeland*, 226 S.W.3d 287, 300-01 (Tenn. 2007) (same); *State v. Ramirez*, 817 P.2d 774, 781 (Utah 1991) (confirming the factors announced in *State v. Long*, 721 P.2d 483 (Utah

(continued . . . )

The current body of research makes a strong case for this Court not simply to break free from reliance on the *Manson* test, but also to develop a more rigorous protocol for assessing eyewitness identification reliability in Maryland courts.

*This Court's rejection of the substantial body of research*

Though paying lip service to the growing body of social science research, the Court refuses to consider seriously the scientific knowledge that the research has produced. The Court dismisses Amici's invitation to reverse this Court's endorsement of the *Manson* test in favor of the alternative trend in which the neuropsychological underpinnings of memory are considered as guides of reliability. Four years ago, we declined a similar invitation to adopt the *Henderson* "theories and methodologies" because "we [were] satisfied with the two-part test set out in [*Jones*] for determining the admissibility of an extrajudicial eyewitness identification." *Smiley v. State*, 442 Md. 168, 179-80 (2015) (citing *Jones v. State*, 310 Md. 569, 577 (1987)).[6]

Today, the Court "reaffirm[s] the well-settled [*Manson*] test," slip op. at 1, and the *Smiley* rejection of *Henderson*:

> In *Smiley*, we had the opportunity to adopt New Jersey's framework for assessing the admissibility of eyewitness identifications, but we did not do so. . . . Consistent with our decision in *Smiley*, we decline the invitation to abandon the *Manson-Jones* framework, which Maryland courts use, and have

( . . . continued)
1986), that "more precisely define the focus of the relevant inquiry" than *Biggers*); *State v. Discola*, 2018 VT 7, ¶¶ 30-31, 184 A.3d 1177, 1188-89 (Vt. 2018) (abandoning witness certainty as a factor for evaluating reliability).

[6] I joined the unanimous opinion of the Court in *Smiley*. That does not mean, though, that I owe continued allegiance to the reasoning and holding of that case in the face of all that we now understand about the frailty of the *Manson* test.

13

used for decades, to assess due process challenges to extrajudicial identification procedures. The reliability inquiry remains to be whether, under the totality of the circumstances, the challenged identification was reliable, despite the suggestiveness in the identification procedure.

*Id.* at 14-15 (footnote and citations omitted). The Court, again, too hastily dismisses the research that New Jersey and other courts have used to facilitate much needed procedural improvements in applying identification law.

*Departing from stare decisis?*

To be clear, I do *not* argue here that the Court adopt and apply to the present case a new test for determining the reliability of an eyewitness identification. What I do propose is that the Court, going forward, forgo its continued adherence to the *Manson-Jones* "framework[] which Maryland courts . . . have used for decades." *Id.* Such reliance is no reason to ignore science.

It is of little surprise that the presence of one or more of the system variables listed in *Henderson* can significantly influence the outcome of a motion to suppress an eyewitness identification. The good news, as noted in *Henderson*, is that system variables are "within the State's control." *Henderson*, 27 A.3d at 896. With diligence by legislatures and courts, procedures are being implemented to "take[] fully into account the scientific research on memory, perception, and the impact of system and estimator variables to continue to promote the due process concerns that originally animated this Court's adoption of the *Manson/Jones* test," Brief of Innocence Project at 24.

It could be argued—and, indeed, the Court holds, slip op. at 15-16—that Maryland judges, acting individually, could consider many of the system and estimator variables

14

under the umbrella of the *Biggers* factors or that nothing *prohibits* a trial court's consideration of additional factors. However, given that the Court today "do[es] not revise this Court's jurisprudence for assessing the admissibility of eyewitness identifications," slip op. at 15, there remains no *requirement* for a trial court to consider any factors other than the traditional five, flawed as they are. Moreover, no additional prophylactic procedure, like the *Henderson* four-step, has been implemented.

Enough of our sister states still retain the *Manson-Jones* framework that it cannot seriously be labeled a "remnant of [an] abandoned doctrine," *Houghton v. Forrest*, 412 Md. 578, 587 (2010) (alteration in original). However, some states' jurisprudence indicates that "the state of the law as a whole has evolved," *id.*, or is fast evolving. We ought not be bound by precedent where it incorporates disproven assumptions or premises about the reliability of memory.

*Conclusion*

> "[T]he law will always lag behind the sciences to some degree because of the need for solid scientific consensus before the law incorporates its teachings. . . ." Appellate courts have a responsibility to look forward, and a legal concept's longevity should not be extended when it is established that it is no longer appropriate.

*Brodes*, 614 S.E.2d at 771 (alterations in original) (citations omitted).

There is no reason Maryland cannot commit to a new framework. A variety of solutions could help Maryland courts, in ruling on a suppression motion, avoid the "primary evil" of "'a very substantial likelihood of irreparable misidentification,'" *Biggers*, 409 U.S. at 198, and help jurors better determine the weight to be accorded to an identification offered at trial. For those purposes, I suggest that this Court direct the Rules

Committee to craft and propose rules of procedure that bring scientific rigor to the assessment of an eyewitness identification that a defendant has challenged as unduly suggestive and, ultimately, unreliable. To that end, worthy of consideration is the *Henderson* court's new four-part procedure for evaluating suggestiveness and reliability. *See* 27 A.3d at 920, *supra*. I also endorse the concept of leaving "to the trial court the decision whether to allow expert testimony in an individual case." *Id.* at 925. Likewise, I suggest that this Court ask the Criminal Subcommittee of the Standing Committee on Maryland Pattern Jury Instructions to create a pattern jury instruction for use in the appropriate case, to better guide jurors. I await the day—which cannot come too soon— when this Court, prompted by the research on potential fallibility of eyewitness identification evidence, takes meaningful steps to improve Maryland's pretrial and trial-related procedures, so as to mitigate, if not eliminate, the present concerns that attend the admission of, and weight given to, such evidence in future cases.

Judge Adkins and Judge McDonald have authorized me to state that they join this opinion.