*Karon Sayles v. State of Maryland*, No. 2794, Sept. Term, 2018; *Dalik Daniel Oxely v. State of Maryland*, No. 2797, Sept. Term 2018, *Bobby Jamar Johnson v. State of Maryland*, No. 2798, Sept. Term 2018. Opinion filed on April 1, 2020, by Berger, J.

CRIMINAL LAW – JURY NULLIFICATION

Jury nullification is a jury's knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness. The power of juries to nullify is well-established.

CRIMINAL LAW – JURY NULLIFICATION – ARGUMENT TO THE JURY AND INSTRUCTION BY THE COURT

It is improper for parties to argue nullification to the jury and for the trial court to expressly instruct the jury that it is permitted to disregard the court's instructions on the law.

CRIMINAL LAW – JURY NULLIFICATION – RESPONSE TO JURY QUESTION REGARDING NULLIFICATION

When a trial judge received a question from the jury asking about its power to nullify a verdict, the trial court committed reversible error when it instructed the jury that nullification is "contrary to law" and would "violate" a court order. Because a jury's power to nullify is well-established, it cannot be said to be "contrary to law." The trial court's instruction that nullification would "violate" a court's order suggested that jurors could face legal consequences for engaging in jury nullification, and there is no legal authority to support such an instruction.

CRIMINAL LAW – JURY NULLIFICATION – RESPONSE TO JURY QUESTION REGARDING NULLIFICATION – DEFINITION OF JURY NULLIFICATION

When instructing the jury that nullification was "contrary to law," the trial court defined jury nullification as "a juror's knowing and deliberate rejection of the evidence or refusal to apply the law." It is the motivation for the rejection of evidence that makes a rejection jury nullification, not simply the rejection itself. It is the jury's role to determine the credibility of witnesses, weigh conflicting evidence, and determine what evidence to accept and what to reject. By instructing the jury that jury nullification, which the court defined as the "knowing and deliberate rejection of the evidence or refusal to apply the law," was contrary to the law and would violate a court order, the trial judge not only provided an instruction containing an inaccurate statement of law but also usurped the jury's role as factfinder.

CRIMINAL LAW – MOTION TO SUPPRESS – IMPERMISSIBLY SUGGESTIVE PHOTO ARRAY

The trial court did not err by denying a motion to suppress when digital alterations to the other photographs in an array, which were made in order to make all of the faces appear to have a similar facial tattoo, were not obvious and did not draw attention to the appellant's photograph.

Circuit Court for Montgomery County
Case Nos. 132377, 132379, 132381

REPORTED

IN THE COURT OF SPECIAL APPEALS
OF MARYLAND

Nos. 2794, 2797, 2798

September Term, 2018

_____

KARON SAYLES

v.

STATE OF MARYLAND

_____

DALIK DANIEL OXELY

v.

STATE OF MARYLAND

_____

BOBBY JAMAR JOHNSON

v.

STATE OF MARYLAND

_____

Berger,
Arthur,
Eyler, James R.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Berger, J.

_____

Filed: April 1, 2020

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document
is authentic.



Suzanne C. Johnson, Clerk

Karon Sayles, Dalik Daniel Oxely and Bobby Jamar Johnson (collectively, the "appellants") were convicted of multiple offenses stemming from a home invasion and armed robbery that occurred in Silver Spring, Maryland on August 1-2, 2017. Also charged with committing the home invasion and related crimes were Younus Muayad Alaameri and Edwin Ajeo, both of whom entered guilty pleas before the appellants' trial began. The appellants were tried together before a jury in the Circuit Court for Montgomery County.

On appeal, the appellants present six issues for our review,[1] which we have rephrased as follows:

1. Whether the circuit court abused its discretion by denying the appellants' motion to recuse the trial court judge.

2. Whether the circuit court's jury instructions regarding jury nullification contained inaccurate statements of law.

3. Whether the circuit court's jury instructions regarding jury nullification were impermissibly coercive and violated the appellants' constitutional right to a fair trial.

4. Whether the circuit court abused its discretion by denying the appellants' motions for mistrial.

5. Whether the circuit court erred by denying Sayles's motion to suppress photographic identifications.

6. Whether all but one of the appellants' convictions and sentences for conspiracy should be vacated.

---

[1] Each appellant filed a separate brief in this case and not all of the appellants presented argument on each of the issues. Sayles presented argument on all of the appellate issues. Oxely and Johnson each presented argument on some of the appellate issues, but, in addition, Oxely and Johnson adopted by reference any arguments asserted by co-appellants to the extent that those arguments could be asserted by and applied to each appellant.

For the reasons explained herein, we shall hold that the trial court's instructions regarding jury nullification contained inaccurate statements of law that prejudiced the appellants. We, therefore, shall vacate the appellants' convictions and remand for a new trial. Because the issue premised upon the trial court's denial of Sayles's motion to suppress is likely to arise on retrial, we shall also address this issue. We shall not address the remaining appellate issues.

## FACTS AND PROCEEDINGS[2]

At the time of the incidents forming the basis for the appeal, Aracely Ochoa resided in a two-bedroom apartment in Silver Spring, Maryland, which she shared with her husband, David Rivera; Ms. Ochoa's mother and stepfather, Blanco Armina Campos and Rolando Callejas; and Ms. Ochoa and Mr. Rivera's minor son, D.R. Ms. Ochoa worked as a manager at a nearby Cash Depot store, where customers would come to cash checks and send money orders.

On August 1, 2017, Ms. Ochoa worked until approximately 8:30 p.m., after which she took the bus home. She left shortly thereafter to pick up her son from her sister's home. When leaving for her sister's home, Ms. Ochoa observed a group of men outside her apartment who were dressed like maintenance workers. After Ms. Ochoa left, four men knocked on the apartment door. Mr. Rivera opened the door; the men claimed they were there for maintenance and insisted on entering the apartment. When Ms. Ochoa returned

---

[2] The issues raised on appeal are largely unrelated to the evidence presented at trial. We present the following limited factual background in order to provide context. We do not endeavor to present the evidence adduced at trial in detail.

with D.R., the apartment door was open and four men were inside with Mr. Rivera. Mr. Callejas was also present in the apartment, but Ms. Campos was still at work. Ms. Ochoa took D.R. to a bedroom to put him to bed.

When Ms. Ochoa returned to the living room, the four men asked her about remodeling the apartment. A fifth man entered the apartment shortly thereafter. Ms. Ochoa recalled that all five men were wearing gloves. Ms. Ochoa recognized one of the men, Younus Alaameri, as a regular customer at Cash Depot. Alaameri would come into Cash Depot to wire money to Iraq; Ms. Ochoa referred to him as "Iraq" or "the Iraqi." Alaameri asked the rest of the men if they were "ready," after which four of the men suddenly attacked Mr. Rivera while the man Ms. Ochoa identified as Bobby Johnson held her down. Mr. Rivera, Ms. Ochoa, and Mr. Callejas were bound with zip-ties and forced to lie face-down on the floor.

Alaameri asked Ms. Ochoa for the keys to the Cash Depot and for the alarm system code. Alaameri hit Ms. Ochoa in the head with a pocket-knife and threatened to harm D.R. if Ms. Ochoa did not cooperate. Ms. Ochoa told Alaameri that the keys were in her purse and provided the code to the safe. Ms. Ochoa told Alaameri that she did not have the code to the alarm system. Ms. Ochoa explained at trial that the alarm system activated automatically at 10:00 p.m. and would always be deactivated by the time she arrived at work at approximately 7:30 a.m. the next morning.

Alaameri sent Johnson and Oxely to the Cash Depot. Alaameri told Ms. Ochoa that if the alarm went off at the Cash Depot and she received a telephone call from the alarm company, she should tell them that the two people were cleaning the store. Johnson and

3

Oxely returned to the home and informed the other men that the alarm had sounded when they attempted to enter the Cash Depot. Alaameri threatened to gouge Ms. Ochoa's eye if she did not provide the alarm code.

At approximately midnight, Mr. Callejas's telephone rang. Ms. Campos was attempting to call and tell her husband that she was on her way home from work. After the telephone rang, the men took Ms. Ochoa, Mr. Rivera, and Mr. Callejas into a bedroom and put them on the bed. When Ms. Campos arrived home at approximately 1:00 a.m., she was dragged through the door. One of the men took her purse and put a knife to her side. She was taken to the bedroom where the other family members were located and a blanket was thrown over her face.

Alaameri brought Ms. Ochoa to the living room and told her that she would be going to Cash Depot with some of the men. Alaameri threatened to kill D.R. if Ms. Ochoa made "any stupid step." Johnson and Oxely accompanied Ms. Ochoa to Cash Depot in Ms. Ochoa's family's van. When they arrived, Ms. Ochoa's boss was there, so they returned to the apartment. After they returned, Alaameri told Ms. Ochoa that the new plan was that Ms. Ochoa would go to work in the morning and retrieve the money then. On the morning of August 2, 2017, Ms. Ochoa was driven to Cash Depot again. This time, she was accompanied by Johnson only. When they arrived, they discovered a crossbar on the door preventing access.

At some point while Ms. Ochoa and Johnson were gone, Oxely put a knife to Mr. Rivera's neck and Mr. Rivera's neck began to bleed. Mr. Rivera and Oxely engaged in "a scuffle" and Oxely dropped the knife, after which Sayles handed Oxely another knife and

4

Oxely "slashed" Mr. Rivera. Mr. Rivera was able to gain possession of the knife and went out to the living room. Mr. Rivera yelled "police" repeatedly, and Oxely ran out the front door. Mr. Callejas broke a window and climbed out to seek help. Mr. Callejas went to a bus stop, where he found a telephone to call police. Ms. Campos also climbed through the window. When Ms. Ochoa and Johnson returned from the Cash Depot, Ms. Ochoa saw Ms. Campos running across the street. Johnson told Ms. Ochoa to make Ms. Campos go back into the apartment and threatened D.R.'s life. Ms. Ochoa, Ms. Campos, and Johnson returned to the apartment; Mr. Rivera opened the door and pulled Ms. Ochoa and Ms. Campos inside. Johnson "took off running." At this point, all of the assailants had left the apartment. Police were called. After the incident, several items, including a computer, watches, documents, and currency, were missing from the apartment. Police officers arrived at the apartment at approximately 8:00 a.m.

The appellants, Alaameri, and Ajeo were ultimately identified as the men involved in the home invasion and were each charged with forty-two offenses, including home invasion, kidnapping, armed robbery, assault, multiple conspiracy offenses, and other associated offenses. Ajeo entered a guilty plea and testified against the appellants at trial. His testimony described the agreement among the five men to make "quick money" by using Ms. Ochoa to rob the Cash Depot store. Ajeo further testified regarding the planning undertaken by the five men in the days preceding the home invasion.

Following a jury trial, Sayles was found guilty of home invasion, multiple counts of armed robbery, kidnapping, second-degree burglary, first-degree assault, multiple counts of second-degree assault, multiple counts of false imprisonment, motor vehicle theft, and

associated conspiracies. Sayles was sentenced to a total term of forty-two years in prison.

Oxely was found guilty of home invasion, multiple counts of armed robbery, kidnapping,

second-degree burglary, first-degree assault, multiple counts of second-degree assault,

multiple counts of false imprisonment, motor vehicle theft, and associated conspiracies.

Oxely was sentenced to a total term of fifty years' imprisonment. Johnson was found guilty

of home invasion, multiple counts of armed robbery, kidnapping, second-degree burglary,

multiple counts of second-degree assault, multiple counts of false imprisonment, motor

vehicle theft, and associated conspiracies.[3] Johnson was sentenced to a term of forty years'

imprisonment.[4]

Additional facts shall be discussed as necessitated by our consideration of the issues

on appeal.

## DISCUSSION

## I.

The first issues we shall address on appeal focus on the circuit court's response to

several jury notes inquiring about jury nullification.

---

[3] Unlike his co-defendants, Johnson was found not guilty of first-degree assault and conspiracy to commit first-degree assault.

[4] The length of sentences set forth for each appellant includes multiple sentences that were ordered to be served concurrently.

*A.    Relevant Procedural Background*

On the first day of jury deliberations on August 29, 2018, the jury sent its first of three notes[5] about jury nullification, inquiring, "Do we have the right to use jury nullification of a charge?"   Counsel for Oxely deferred to the court on how to respond. Counsel for Johnson argued, "[O]ur position would be that [the circuit court should] instruct the jury that deliberations and rendering the verdicts [are] in the sole providence [(sic)] of the jury."  Counsel for Sayles asked the court to answer, "Yes."  The trial court instructed the jury (the "First Nullification Instruction") as follows: "Your verdict must be based solely on the evidence.  Your choices are not guilty or guilty.  Reread your instructions."   The court noted Johnson's and Sayles's objections to the court's supplemental instruction.

Later the same day, the jury sent another note, asking, "Can you answer the jury nullification with a yes or no response?"  The record reflects that the circuit court met with counsel in chambers to discuss the note, but the record is silent as to the content of the discussion in chambers.  Thereafter, the circuit court verbally instructed the jury as follows (the "Second Nullification Instruction"):

> Now, I am not a hundred percent sure that the juror or jurors that wrote the question have the same definition of jury nullification as the law has it.
>
> But if it is, then here's the answer.  Here's what jury nullification is.  Jury nullification, a juror's knowing and deliberate rejection of the evidence or refusal to apply the law,

---

[5] The jury sent a total of nineteen notes over three days of deliberation.

7

that's considered jury nullification.[6]  And the answer is no, you can't have jury nullification.  You have to decide this case based on the evidence as you find it and apply the law as I gave it to you.

You decide the facts, the weight of the evidence, you, the 12, then you apply the law.  To say you can do jury nullification would be a miscarriage of justice because there'd be no reason reading you the law and no reason you considering the evidence.  And that wouldn't make sense would it?  You are the only ones that weigh the evidence.  You decide what weight you want to give it, what you find.

Once you get to where you are with the evidence, you take the law as I give it to you, you put it together and apply it and try and reach a verdict.  So, your decision is going to be made on the evidence, applying your common sense, your past life experiences and you're going to take the law and apply it to all of that.  So, nullification shouldn't even be a consideration.  It's not on the verdict sheet.  It's not in the instructions.  Okay, I think I've said enough on that.

After the circuit court finished instructing the jury, counsel for Sayles placed his objection to the court's instruction on the record, explaining "we object to the instruction that was given.  What we asked for [was] that the jury be told that they are the ones who will ultimately decide the facts as they see them and apply the law."  Thereafter, the jury was dismissed for the evening.

The jury returned to continue deliberations the next morning.  The circuit court received another note inquiring about jury nullification, which provided as follows:

---

[6] It appears that the trial court's definition of jury nullification was drawn from the Black's Law Dictionary, which defines "jury nullification" as "[a] jury's knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness." *Jury Nullification*, Black's Law Dictionary (11th ed. 2019).

Why if there is a legal definition of jury nullification where a juror can refuse to apply the law, there's no legal circumstances where that can occur. Can you please cite the specific law that does not allow a juror the right to jury nullification in the State of Maryland. From juror 112.

Counsel for Johnson argued that the jury had already been provided a definition of jury nullification and asserted that "it seems that there's some inkling of belief that the elements are not being met." Counsel for Johnson requested the court instruct the jury that "it is not the providence [(sic)] of the Court to second-guess the juror's analysis of the evidence" and to reiterate that the options were guilty or not guilty. Counsel for Sayles argued that "there is no law that does not allow a juror the right to jury nullification." Counsel for Sayles continued:

[T]he best that I've been able to find is there's case law saying that it's not proper for the judge to instruct the jury at the attorney's request and it's not proper to make arguments in closing, but I'm not aware of any law that says that the jury cannot use nullification. I would suggest that we cite the Maryland Constitution Article 23 in the trial [of all] criminal cases, the jury shall be the judges of the law as well as of fact. The clause ends, except that the Court could pass upon a sufficiency of the evidence to sustain a conviction, I don't know that that last clause is necessary, but I think that what the jury wants to know is, is there any law that does nor does not allow a juror the right to jury nullification in the State of Maryland, I think the answer is no. But I think the Maryland Constitution does provide the closest possible answer which is the jury shall be the judge of law as well [of] fact . . . .

The circuit court responded that the jury is "not the judge of the law" and the court explained that it was "not going to advise [the jury] of anything close to it." The court explained that it intended to direct its written instruction to Juror 112, who had been identified on the jury note. Counsel for Johnson asked the court to direct the note to the

9

foreperson, explaining, "I just don't want [Juror 112] to feel like we're ganging up on him." The circuit court acquiesced and did not address the response to Juror 112 specifically.

The circuit court informed the parties of its intended instruction and commented, "I believe that the Defense, all three defendant[s] would object to that instruction for the reasons you've stated, correct?" The transcript reflects that counsel for Sayles and counsel for Johnson responded, "Yes." The court subsequently instructed the jury (the "Third Nullification Instruction") as follows:

> Ladies and gentlemen of the jury you may not use, implement or resort to jury nullification. It is improper, it's contrary to the law [and] would be a violation of your oath to truly try and reach a verdict according to the evidence, which you all took that oath. Furthermore, nullification would violate this Court's order and it's the law of Maryland that "you must apply the laws I explained it in arriving at your verdict," sincerely me. I'll give you a copy of that.[7]

---

[7] The written instruction given to the jury was slightly different than the trial court's oral instruction and provided:

> Jurors:
>
> You may not use or implement or resort to jury nullification. It is improper, contrary to the law and would be a violation of your oath to "truly try to reach a verdict according to the evidence."
>
> Furthermore, nullification would violate to [(sic)] Court's Order that "you must apply to [(the)] law as I explain it in arriving at your verdict."
>
> Sincerely,
>
> [The Trial Judge]

The minor differences between the oral instruction and written instruction are irrelevant to our analysis.

10

The circuit court followed its instruction on jury nullification with a modified *Allen* instruction.[8]

The appellants assert that the circuit court's Second and Third Nullification Instructions contained inaccurate statements of law that deprived the appellants of their constitutional rights to a fair trial. In the alternative, the appellants assert that the circuit court's instructions on jury nullification were impermissibly coercive and violated the appellants' rights to a fair trial. As we shall explain, we agree with the appellants that the trial court's Second and Third Nullification Instructions were legally incorrect and prejudicial.

### B.     *Preservation*

First, we briefly address preservation arguments raised by the State in response to certain of the appellants' arguments regarding the alleged impropriety of the circuit court's responses to the jury's notes regarding jury nullification. The State asserts that appellant Oxely's challenge to the circuit court's nullification instructions is not preserved. The State emphasizes that Oxely did not lodge an objection to the circuit court's First or Second Nullification Instructions and did not answer in the affirmative when the trial court

---

[8] While the circuit court was considering its response to the third jury nullification note, the jury sent another note asking, "What do we do in the case of the presence of guilty and non-guilty votes and we feel that further deliberations will not change these votes." In response, the circuit court gave the modified *Allen* charge. "The term *Allen* instruction is a legal eponym derived from a United States Supreme Court opinion approv[ing] the use of an instruction in which the jury was specifically asked to conciliate their differences and reach a verdict." *State v. Hart*, 449 Md. 246, 255 n.1 (2016) (quotation omitted).

11

inquired, before issuing the Third Nullification Instruction, "all three defendant[s] would object to that instruction for the reasons you've stated, correct?"

With respect to Johnson, the State acknowledges that Johnson objected to the First Nullification Instruction, but asserts that the only basis for Johnson's objection was that the instruction was "a little bit coercive." The State observes that Johnson did not raise an objection to the Second Nullification Instruction and that, although Johnson answered "yes" after the trial court inquired as to whether he was objecting to the Third Nullification Instruction, Johnson did not object after the trial court provided the supplemental instruction. The State further emphasizes that Johnson specifically argued that the court should instruct the jury that the court would not "second-guess the juror's analysis of the evidence" and did not argue -- as did Sayles -- that the court's proposed instruction was an inaccurate statement of law. The State acknowledges that Sayles argued before the circuit court that the Second and Third Nullification Instructions were not accurate statements of law, but Sayles did not specifically argue that the content of the court's instructions was coercive.

We are left to untangle this procedural thicket of which issues are preserved as to which appellants. Rule 4-323(c) governs objections to rulings or orders beyond those concerning evidence and provides as follows:

> For purposes of review by the trial court or on appeal of any other ruling or order, it is sufficient that a party, at the time the ruling or order is made or sought, makes known to the court the action that the party desires the court to take or the objection to the action of the court.

12

Generally, "in cases involving multiple defendants each defendant must lodge his own objection in order to preserve it for appellate review and may not rely, for preservation purposes, on the mere fact that a co-defendant objected." *Williams v. State*, 216 Md. App. 235, 254 (2014). "One defendant, of course, may expressly join in an objection made by a co-defendant but he must expressly do so. It is not implicit." *Id.* An exception to this rule exists when the trial court makes clear that its ruling applies to all defendants. *Bundy v. State*, 334 Md. 131, 145-47 (1994).

We are persuaded that Sayles objected to all three of the nullification instructions on the basis that the instructions were inaccurate statements of law. Johnson objected to the First and Third Nullification Instructions, arguing that the court should instruct the jury that the court would not second-guess the verdict of the jury. Oxely did not expressly place his objection on the record, but the circuit court declared its belief, before giving the Third Nullification Instruction, that "all three defendant[s] would object to that instruction." The circuit court's stated belief could have caused counsel for Oxely to conclude that voicing an express objection would be, at that point, redundant. Furthermore, the court's express belief that all three defendants intended to object to the instruction indicates that the trial court's ruling was expressly applicable to all defendants. *Bundy*, *supra*, 334 Md. at 145-47.

To the extent that the issues related to the nullification instructions may be unpreserved, and to the extent that the appropriateness of the trial court's nullification instructions was challenged before the trial court on different grounds by different appellants, we shall nonetheless exercise our discretion to consider the issues as to all appellants. Pursuant to Maryland Rule 8-131(a), "[o]rdinarily, [we] will not decide any

13

other issue unless it plainly appears by the record to have been raised in or decided by the trial court," but we "may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal." "[T]he animating policy behind Rule 8-131(a) is to ensure fairness for the parties involved and to promote orderly judicial administration." *Jones v. State*, 379 Md. 704, 714 (2004). This Court and the Court of Appeals "usually elect to review an unpreserved issue only after it has been thoroughly briefed and argued, and where a decision would (1) help correct a recurring error, (2) provide guidance when there is likely to be a new trial, or (3) offer assistance if there is a subsequent collateral attack on the conviction." *Bailey v. State*, 464 Md. 685, 698 (2019) (quotation and citation omitted).

In this case, to the extent that the appellate issues regarding the trial court's nullification instructions are not preserved as to certain appellants, we choose to exercise our discretion to review the unpreserved issues as to all appellants. The issues have been fully briefed and argued. Furthermore, we believe this decision may be of assistance to trial courts in responding to inquiries regarding jury nullification in the future. Finally, were we to address the propriety of the nullification instructions for certain appellants but not for others, the issues would likely arise in a subsequent collateral attack. Therefore, we will review these issues on their merits.[9]

---

[9] Our decision to exercise our discretion to consider issues that may be unpreserved as to certain appellants in this particular case should not be viewed as an indication that we will review unpreserved issues in future cases.

14

## C. *Standard of Review for Jury Instructions*

When reviewing a trial court's decision to propound a particular jury instruction, we apply the abuse of discretion standard. *Appraicio v. State*, 431 Md. 42, 51 (2013). When considering whether the trial court abused its discretion in this context, we consider whether: (1) the instruction is a correct statement of law; (2) the instruction is applicable to the facts of the case; and (3) the content of the instruction was fairly covered elsewhere in instructions actually given. *Carroll v. State*, 428 Md. 679, 689 (2012) (quotations and citations omitted). A trial court has no discretion to give a legally incorrect jury instruction. *Armacost v. Davis*, 462 Md. 504, 523 (2019) ("A trial court abuses its discretion if it commits an error of law in giving a particular jury instruction.").

The Court of Appeals has explained that "[t]rial judges walk a fine line when answering questions posed by jurors during the course of their deliberations. Any answer given must accurately state the law and be responsive to jurors' questions without invading the province of the jury to decide the case." *Appraicio*, *supra*, 431 Md. at 44. The trial judge must give instructions that are "correct statement[s] of the law and . . . applicable under the facts of the case" and "must respond to a question from a deliberating jury in a way that clarifies its confusion, such that the judge's response is not ambiguous or misleading." *State v. Bircher*, 446 Md. 458, 463-64 (2016). The Court of Appeals has further instructed that "[a] trial judge, moreover, should avoid answering questions in a way that improperly comments on the evidence and invades the province of the jury to decide the case." *Id.* at 465. We shall keep these principles in mind when evaluating the

15

instructions propounded by the trial court in response to the jury's questions regarding its power to nullify.

When assessing the appropriateness of the trial court's instructions, we shall focus on the following specific portions of the trial court's Second and Third Nullification Instructions:[10]

- Jury nullification, a juror's knowing and deliberate rejection of the evidence or refusal to apply the law, that's considered jury nullification.

- You may not use or implement or resort to jury nullification.

- [Jury nullification] is improper, contrary to the law and would be a violation of your oath to 'truly try to reach a verdict according to the evidence.'

- [N]ullification would violate this Court's order . . . .

---

[10] When arguing that the court's Second Nullification Instruction contained an inaccurate statement of law, the appellants focus specifically on the court's definition of jury nullification as "a juror's knowing and deliberate rejection of the evidence or refusal to apply the law." We observe that the following portions of the trial court's Second Nullification Instruction are potentially problematic as well:

- Here's what jury nullification is . . . And the answer is no, you can't have jury nullification.

- To say you can do jury nullification would be a miscarriage of justice . . . .

- [N]ullification shouldn't even be a consideration.

Because the appellants have focused their appellate argument on whether the definition of jury nullification in the Second Nullification Instruction, as well as the Third Nullification Instruction, contained inaccurate statements of law, we shall not address the legal correctness of other portions of the Second Nullification Instruction.

Specifically, we shall evaluate whether the above-quoted instructions were legally correct. This is an assessment we undertake *de novo*. *See*, *e.g.*, *Carter v. State*, 236 Md. App. 456, 475, *cert. denied*, 460 Md. 9 (2018) ("Although the overall determination is one of abuse of discretion, we review without deference . . . whether the jury instruction was a correct statement of the law." (internal quotation and citation omitted)).

### D.     *Jury Nullification and the Instructions at Issue in this Appeal*

As we referenced *supra* in footnote 5, Black's Law Dictionary defines jury nullification as "[a] jury's knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness." *Jury Nullification*, Black's Law Dictionary (11th ed. 2019). Juries have engaged in nullification since the founding of the United States. *See generally* Paul Butler, *In Defense of Jury Nullification*, LITIGATION, Fall 2004. Indeed, as the Court of Appeals for the District of Columbia observed in 1972, "[t]he pages of history shine on instances of the jury's exercise of its prerogative to disregard uncontradicted evidence and instructions of the judge," such as in acquittals of prosecutions under the fugitive slave law. *United States v. Dougherty*, 473 F.2d 1113, 1130 (D.C. Cir. 1972). *See also* Bradley J. Huestis, *Jury Nullification: Calling for Candor from the Bench and Bar*, 173 MIL. L. REV. 68, 72-88 (2002) (discussing the history of jury nullification at length).

Jury nullification has long been a controversial concept. Butler, *In Defense of Jury Nullification*, *supra*, at 46-48; *see also Dougherty*, *supra*, 473 F.2d at 1130-37. Some scholars advocate for the use of jury nullification in certain cases, such as in cases involving

African American defendants who are accused of nonviolent drug crimes. Leigh Ainsworth, *Jury Nullification: Fixing the Law When Politicians Won't*, 53 AM. CRIM. L. REV. ONLINE 26, 26 (2016) (citing Paul Butler, *Jurors Need to Take the Law into Their Own Hands*, WASH. POST (Apr. 5, 2016), available at https://www.washingtonpost.com/news/in-theory/wp/2016/04/05/jurors-need-to-take-the-law-into-their-own-hands/). Other scholars disagree and assert that jury nullification undermines the sanctity of the legal system. *Id.* (citing John W. Bissell, Comments on Jury Nullification, 7 CORNELL J. L. & P. 51, 51 (1997) ("To ignore the law and render an ad hoc decision, which occurs with jury nullification, is a gross perversion of the legal system.")). There are also advocates on either side of the nullification debate who ground their respective arguments on a re-energized interpretation of Maryland's Article 23. *See*, *e.g.*, Paul Butler, Racially Based Jury Nullification: Black Power in the Criminal Justice System, 105 YALE L.J. 677, 704 n.147 (1995) (discussing Maryland's Article 23 in support of his argument *for* jury nullification); Richard St. John, License to Nullify: The Democratic and Constitutional Deficiencies of Authorized Jury Lawmaking, 106 YALE L.J. 2563, 2569-71 (1997) (discussing Maryland's Article 23 in support of his argument *against* jury nullification).[11]

The power of juries to nullify is well-established and long-acknowledged. The United States Supreme Court addressed jury nullification over a century ago in the case of

---

[11] For additional scholarship on jury nullification, see Teresa L. Conaway, Carol L. Mutz, & Joann M. Ross, Jury Nullification: A Selective Annotated Bibliography, 39 VAL. U.L.REV. 393 (2004).

*Sparf v. United States*, 156 U.S. 51 (1895).[12]  In *Sparf*, the Supreme Court observed that juries have the "physical power" to disregard the law, but do not "have the moral right to decide the law according to their own notions of pleasure." *Id.* at 74.  Federal appellate courts have held that, although jurors have the power to nullify a verdict, "neither the court nor counsel should encourage jurors to exercise this power." *See*, *e.g.*, *United States v. Sepulveda*, 15 F.3d 1161, 1190 (1st Cir. 1993) (citing *United States v. Trujillo*, 714 F.2d 102, 106 (11th Cir. 1983)).  The United States Court of Appeals for the Second Circuit has further explained that, although it is well-established that juries have the power to nullify, that power should not be "encourage[d] or permit[ted]" by a judge "if it is within [the judge's] authority to prevent." *United States v. Thomas*, 116 F.3d 606, 615 (2d Cir. 1997).[13]

---

[12] *Sparf* specifically carved out an exception from its holding for states, like Maryland, that have (or had) a contrary constitutional provision. *Sparf*, *supra*, 156 U.S. at 102 ("[W]here the matter is not controlled by express constitutional or statutory provisions, it cannot be regarded as the right of counsel to dispute before the jury the law as declared by the court.").  As such, we understand *Sparf* (and the lower federal court cases that follow it), not binding, but persuasive authority worthy of our consideration.

[13] The issue before the court in *Thomas* was whether a juror may be dismissed for "just cause" under Federal Rule of Criminal Procedure 23(b) for "engag[ing] in 'nullification' - the intentional disregard of the law as stated by the presiding judge - during the course of deliberations." 116 F.3d at 608.  Several other members of the jury had raised wide-ranging complaints about a juror to the court, and the court investigated the complaints by conducting in camera, off-the-record interviews with each juror. *Id.* at 610.  After completing the interviews, the trial judge concluded that the juror's "motives [we]re immoral" and that the juror was "refusing to convict 'because of preconceived, fixed, cultural, economic, [or] social . . . reasons that are totally improper and impermissible.'" *Id.*  The trial court subsequently dismissed the juror; the remaining eleven jurors continued to deliberate and ultimately reached a verdict.

19

Maryland appellate courts have held, consistent with federal courts, that it is not proper for an attorney to argue jury nullification to a jury. *E.g.*, *Blackwell v. State*, 278 Md. 466, 479 (1976) (holding that the defense may not argue nullification to the jury and explaining that the law "does not confer upon [the jury] untrammeled discretion to enact new law or to repeal or ignore clearly existing law as whim, fancy, compassion or malevolence should dictate, even within the limited confines of a single criminal case") (quotation and citation omitted); *Thomas v. State*, 29 Md. App. 45, 52 (1975) (affirming trial court's ruling prohibiting an appellant from presenting a jury nullification argument in closing argument).

It has also been held improper for trial courts to instruct juries that the court's instructions are "merely advisory" and that the jury is free to disregard them. *Montgomery v. State*, 292 Md. 84, 91 (1981). Article 23 of the Maryland Declaration of Rights provides that "[i]n the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact . . . ." Md. Const. Decl. of Rts. art. 23. Prior to 1980, Maryland trial courts regularly

On appeal, the United States Court of Appeals for the Second Circuit explained that a juror's unwillingness to follow the law is an appropriate basis for a "for cause" strike during jury selection and held that "a juror's purposeful refusal to apply the law as set forth in a jury charge" that becomes known to the judge during the course of trial similarly "constitutes an appropriate basis for that juror's removal." *Id.* at 617. Nonetheless, the court held that the trial court's dismissal of the juror was inappropriate because the evidence in the record did not conclusively establish that the juror intended to disregard the law, but rather, "the record evidence raise[d] a possibility that the juror was simply unpersuaded by the Government's case against the defendants." *Id.* at 624. The court discussed at length "[t]he need to protect the secrecy of jury deliberations" and limits on "the court's investigatory powers where the asserted basis for a deliberating juror's possible dismissal is the juror's alleged bias or partiality in joining or not joining the views of his colleagues" but did "not reach the question of whether the court's inquiries were themselves sufficiently intrusive to constitute reversible error." *Id.* at 620, 624.

20

instructed jurors that they were the judge of the law as well as the facts, and that the court's instructions about the law were merely advisory. *Kazadi v. State*, ____ Md. ____, No. 11, Sept. Term, 2019, Slip Op. at 18 (Ct. of App. Jan. 24, 2020) ("For more than a century after 1851, it was common practice for trial courts to instruct jurors that they were the judges of both the law and the facts, and that the jury instructions were 'advisory only.'"). *See also Montgomery*, *supra*, 292 Md. at 86-87; *Stevenson v. State*, 289 Md. 167, 171 (1980).[14]

In 1981, the Court of Appeals held that "advisory only" instructions were unconstitutional because certain instructions are "not advisory" and "cannot be the subject of debate by counsel before the jury." *Montgomery*, *supra*, 292 Md. at 91. The Court explained that there are "bedrock characteristics" of the American criminal justice system that are "indispensable to the integrity of every criminal trial" and that instructions on these matters cannot be considered advisory. *Id.* The "bedrock characteristics" identified by the Court of Appeals are:

> (1) The accused is presumed innocent until proved guilty by the State by evidence beyond a reasonable doubt.
>
> (2) The State has the burden to produce evidence of each element of the crime establishing the defendant's guilt.
>
> (3) The defendant does not have to testify and the jury may infer no guilt because of his silence.

---

[14] In *Unger v. State*, 427 Md. 383, 391 (2012), the Court of Appeals overruled *Stevenson* and *Montgomery* to the extent they held that the new interpretation of Article 23 did not delineate a new substantive standard. In *Unger*, the Court of Appeals held that the *Stevenson* and *Montgomery* opinions substantially changed the state constitutional standard embodied in Article 23 and, therefore, failure to object to advisory only jury instructions prior to *Stevenson* did not constitute a waiver for purposes of collateral review.

(4) The evidence to impeach the defendant bears only on his credibility and may not be used to prove the substance of the offense.

(5) The evidence is limited to the testimony (and reasonable inferences therefrom) and the exhibits admitted into evidence.

(6) Evidence does not include the remarks of the trial judge nor the arguments of counsel.

*Id.*

Instructions on these bedrock characteristics are "binding" because they are the "guidelines of due process to which every jury is required to adhere." *Id.* The Court of Appeals explained that the court's instructions are advisory only in "those instances when the jury is the final arbiter of the law of the crime. Such instances arise when an instruction culminates in a dispute as to the proper interpretation of the law of the crime for which there is a sound basis." *Id.* at 89. The Court of Appeals has reiterated that "jury instructions on fundamental rights, such as the presumption of innocence, the burden of proof, and the right not to testify, 'are not the law of the crime[, and] they are not advisory[.]'" *Kazadi*, *supra*, Slip Op. at 40 (quoting *Montgomery*, *supra*, 292 Md. at 91).[15]

Our review of the law discussed above makes clear that it is improper for parties to argue nullification to the jury and for the trial court to expressly instruct the jury that it is

---

[15] In *Kazadi*, the Court of Appeals once again addressed the binding nature of jury instructions regarding the presumption of innocence, the burden of proof, and the defendant's right not to testify, which the Court described as "long-standing fundamental rights critical to a fair jury trial in a criminal case." Slip Op. at 43. The Court held that, "[o]n request, during voir dire, a trial court must ask whether any prospective jurors are unwilling or unable to comply with the jury instructions on the presumption of innocence, the burden of proof, and the defendant's right not to testify." *Id.* at 45.

22

permitted to disregard the court's instructions on the law. The cases do not, however, directly address how a trial court should respond when a jury specifically inquires about its power to nullify. We must look to additional authority as we attempt to glean the answer to our inquiry.

This Court and the Court of Appeals have acknowledged the jury's power to nullify in various contexts and have not held that juries are prohibited from using jury nullification. For example, the Court of Appeals acknowledged the jury's power to nullify a verdict, albeit in *dicta*, in the case of *Chambers v. State*, 337 Md. 44, 48 (1994). In *Chambers*, the Court evaluated the appropriateness of giving of a mercy instruction to the jury.[16] *Id.* at 45-53. The Court of Appeals held that a mercy instruction should not be given because it was "not the traditional office of the jury to consider mercy," but observed that "[j]uries may have statutory power over punishment in some cases . . . and **they always have the ability to nullify the application of the criminal law to a particular defendant**." *Id.* at 51 (emphasis supplied).[17]

---

[16] At issue in *Chambers* was the former Rule 4-237(f), which provided: "A jury may recommend that the court show mercy to a defendant. The recommendation is not part of the verdict and is not binding upon the court." *Chambers*, *supra*, 337 Md. at 45 n.1 (quoting the former Rule 4-237(f)).

[17] The State urges us to dismiss the *Chambers* Court's reference to a jury's power to nullify because it is *dicta*. To be sure, the statement is not binding, but we do consider it to be persuasive and helpful to our analysis given the limited binding authority on the issue at hand. *See Bowers v. State*, 227 Md. App. 310, 321 (2016) ("'*Obiter dictum*' is typically a judicial comment 'that is unnecessary to the decision in the case and therefore not precedential (although it may be considered persuasive).'" (quoting Black's Law Dictionary 1240 (10th ed.2014)).

23

The Court of Appeals' jurisprudence on inconsistent verdicts in criminal cases further reflects acknowledgment by the Court that juries, in some instances, reach verdicts contrary to the evidence not because the jury disagrees with or is unpersuaded by the evidence presented, but because a conviction is not consistent with the jury's sense of morality or fairness. In *McNeal v. State*, 426 Md. 455, 459 (2012), the Court of Appeals held that "illogical or factually inconsistent" jury verdicts are permitted in criminal cases. In reaching this holding, the Court considered various reasons juries might reach inconsistent verdicts, including internal negotiations, compromise, mistakes, or -- most relevant to our analysis here -- lenity.[18] *Id.* at 472. The Court quoted *United States v. Powell*, 469 U.S. 57, 65 (1984), for the principle that "jury lenity . . . has been recognized by courts and commentators as the 'jury's historic function, in criminal trials, as a check against arbitrary or oppressive exercises of power by the Executive Branch.'" *McNeal*, *supra*, 426 Md. at 472.

The Maryland Pattern Jury Instruction on the presumption of innocence and reasonable doubt does not directly address the jury's nullification power, but it serves as an additional persuasive resource for our analysis:

> The defendant is presumed to be innocent of the charges. This presumption remains throughout every stage of the trial and is

---

[18] We emphasize that, for our purposes, the phrases "jury lenity" and "jury nullification" mean approximately the same thing. Black's Law Dictionary defines "lenity" as "[t]he quality, state, or condition of being lenient; mercy or clemency." *Lenity*, Black's Law Dictionary (11th ed. 2019). The terms have been used interchangeably to mean a jury's power to reach a verdict contrary to the evidence for reasons of mercy or justice. *See*, *e.g.*, *United States v. Thomas*, 116 F.3d 606, 615 (2d. Cir. 1997) (referring to "the power of juries to 'nullify' or exercise a power of lenity").

24

not overcome unless you are convinced beyond a reasonable doubt that the defendant is guilty.

The State has the burden of proving the guilt of the defendant beyond a reasonable doubt. This means that the State has the burden of proving, beyond a reasonable doubt, each and every element of the crime [crimes] charged. The elements of a crime are the component parts of the crime about which I will instruct you shortly. This burden remains on the State throughout the trial. The defendant is not required to prove [his] [her] innocence. However, the State is not required to prove guilt beyond all possible doubt or to a mathematical certainty. Nor is the State required to negate every conceivable circumstance of innocence.

A reasonable doubt is a doubt founded upon reason. Proof beyond a reasonable doubt requires such proof as would convince you of the truth of a fact to the extent that you would be willing to act upon such belief without reservation in an important matter in your own business or personal affairs. If you are not satisfied of the defendant's guilt to that extent for each and every element of a [the] crime charged, then reasonable doubt exists and the defendant **must** be found not guilty of that [the] crime.

Maryland Criminal Pattern Jury Instructions (2d ed. 2018) 2:02 (emphasis supplied). The pattern jury instruction specifically mandates that a "defendant must be found not guilty" in the presence of reasonable doubt. The instruction, however, is entirely silent as to what a jury is or is not required to do in the absence of reasonable doubt.[19]

---

[19] At least one court has characterized a somewhat similar pattern jury instruction as "the equivalent of a jury nullification instruction." *State v. Prudent*, 161 N.H. 320, 324-25 (2010). The New Hampshire pattern instruction at issue in *Prudent* provided that a jury "must" find a defendant not guilty in the presence of reasonable doubt, but only "should" find a defendant guilty in the absence of reasonable doubt. The Supreme Court of New Hampshire explained that "the effect of 'should' in the charge provides the equivalent of a jury nullification instruction that even if the jurors found that the State proved beyond a reasonable doubt all the elements of the offense charged, they could still acquit the defendant." *Id.*

Having set forth the law and persuasive authority relevant to the issue of jury nullification, we are left to determine how to reconcile the following principles which we derived from the above-quoted authority when evaluating the propriety of the instructions at issue in this case: (a) the law is clear that a party may not argue jury nullification to a jury; (b) the law is clear that the trial court may not instruct a jury that it has the power to disregard the law; (c) jury nullification should not be encouraged by a judge if it is within the judge's authority to prevent it; (d) the jury's power to nullify has been long recognized by the Court of Appeals and courts from other jurisdictions; and (e) no law prohibits jurors from engaging in jury nullification or proscribes a consequence for jurors who engage in jury nullification. With these principles in mind, we turn to the specific language of the nullification instructions propounded by the trial court in this case:

- Jury nullification, a juror's knowing and deliberate rejection of the evidence or refusal to apply the law, that's considered jury nullification.

- You may not use or implement or resort to jury nullification.

- [Jury nullification] is improper, contrary to the law and would be a violation of your oath to 'truly try to reach a verdict according to the evidence.'

- [N]ullification would violate this Court's order . . . .

Our review of the authority discussed *supra* leads us to conclude that the trial court's instructions contained inaccurate statements of law, and, therefore, constituted an abuse of discretion. Specifically, we focus upon the trial court's instructions that engaging in jury nullification is "contrary to the law" and would "violate" a court's order. As we have

discussed, the power of the jury to nullify a verdict is well-established. As such, nullification cannot be said to be "contrary to law." Furthermore, the trial court's instruction that a juror who engaged in nullification would be violating a court order is not an accurate statement of law. The authority discussed *supra* plainly establishes that juries have the power to nullify absent any legal consequences. The trial court's instruction suggested to the jury that jurors could potentially face legal consequences for engaging in jury nullification. There is no legal authority to support such an instruction.

Moreover, the trial court's error in instructing the jury that nullification is "contrary to the law" and would "violate" a court's order was compounded by the court's problematic definition of jury nullification. The trial court defined jury nullification as "a juror's knowing and deliberate rejection of the evidence or refusal to apply the law." As we discussed *supra* in footnote 5, this definition appears to be drawn from the Black's Law Dictionary Definition of jury nullification but is incomplete. The full definition of jury nullification as set forth in Black's Law Dictionary is: "A jury's knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness." *Jury Nullification*, Black's Law Dictionary (11th ed. 2019).

It is the precise motivation for a juror's rejection of the evidence that makes such a rejection of evidence jury nullification, not simply the rejection of evidence itself. It is beyond cavil that it is the jury's role to determine credibility of witnesses, weigh conflicting evidence, and determine what evidence to accept and what to reject. *See*, *e.g.*, *Hunter v.*

27

*State*, 397 Md. 580, 588 (2007) ("'In a criminal case tried before a jury, a fundamental principle is that the credibility of a witness and the weight to be accorded the witness' testimony are solely within the province of the jury.'") (quoting *Bohnert v. State*, 312 Md. 266, 277 (1988)); *Turner v. State*, 192 Md. App. 45, 81 (2010) ("[T]he jury has the power to decide which testimony to accept and which to reject. In this regard, it may believe part of a particular witness's testimony, but disbelieve other parts of that witness's testimony.") (quoting *Smith v. State*, 176 Md. App. 64, 69 (2007)); *Smiley v. State*, 138 Md. App. 709, 718 (2001) ("[I]t is the jury's task to resolve any conflicts in the evidence and assess the credibility of witnesses."). By instructing the jury that jury nullification, which the court defined as the "knowing and deliberate rejection of the evidence or refusal to apply the law," was contrary to the law and would violate a court order, the trial judge not only provided an instruction containing an inaccurate statement of law but also usurped the jury's role as factfinder.

We recognize that, as a practical matter, trial judges are proverbially caught between a rock and a hard place when faced with a jury question about the power to engage in jury nullification. Trial judges may not instruct juries that they have the power to engage in jury nullification, nor may trial judges instruct juries that they do not have the power to nullify. We find the United States Court of Appeals for the First Circuit's decision in *Sepulveda*, *supra*, 15 F.3d at 1189, instructive on the issue of how a trial judge may appropriately respond to a jury's inquiry about the power of jury nullification.

In *Sepulveda*, counsel for the defendants "invoked the specter of jury nullification" during closing argument and invited the jury to "send out a question" concerning the

28

doctrine of jury nullification. *Id.* at 1189. The jury subsequently sent a question asking the judge to "[c]larify the law on jury nullification." *Id.* The trial judge responded by instructing the jury as follows, over defense objection:

> Federal trial judges are forbidden to instruct on jury nullification, because they are required to instruct only on the law which applies to a case. As I have indicated to you, the burden in each instance which is here placed upon the Government is to prove each element of the offenses . . . beyond a reasonable doubt, and in the event the Government fails to sustain its burden of proof beyond a reasonable doubt as to any essential element of any offense charged against each defendant, it has then failed in its burden of proof as to such defendant and that defendant is to be acquitted. In short, if the Government proves its case against any defendant, you should convict that defendant. If it fails to prove its case against any defendant you must acquit that defendant.

*Id.* at 1189-90 (ellipses in original).

The United States Court of Appeals for the First Circuit rejected the defendants' argument that the trial court's instruction amounted to a wrongful repudiation of jury nullification. *Id.* at 1190. The court observed that "although jurors possess the raw power to set an accused free for any reason or for no reason, their duty is to apply the law as given to them by the court" but that "neither the court nor counsel should encourage jurors to exercise this power." *Id.* The court further rejected the defendants' assertion that the trial judge "should have stonewalled" in response to the jury's inquiry. *Id.*

The *Sepulveda* court determined that the trial judge's comment was "an accurate recitation of the law and an appropriate rejoinder to the jury's question on nullification." *Id.* The court further explained:

> The court went on to repeat its earlier instruction that if the government proved its case the jury "should" convict, while if the government failed to carry its burden the jury "must" acquit. This contrast in directives, together with the court's refusal to instruct in any detail about the doctrine of jury nullification, left pregnant the possibility that the jury could ignore the law if it so chose. Whether the jury perceived this possibility or not, no error infiltrated the court's supplemental instruction.

*Id.*

We are not suggesting that the instruction given by the trial court in *Sepulveda* is the ideal or preferred method of responding to an inquiry from the jury about its power to nullify. Rather, we discuss the instruction at issue in *Sepulveda* because the trial court cogently responded to the jury's question with a legally correct instruction that neither encouraged nor prohibited jury nullification. The court explained why it was unable to instruct on jury nullification, reminded the jury of the applicable burden of proof, and explained that the jury "should convict" if the government proved its case, but "must acquit" if the government failed to prove its case. Critically, the trial court's instruction in *Sepulveda* did not expressly forbid the jury from engaging in jury nullification, nor did the instruction incorrectly advise jurors that they may suffer legal consequences if they do so.

We do not proscribe a particular instruction trial courts must propound when responding to a question about jury nullification. When faced with a question about jury nullification, trial judges may remind jurors of their oath or repeat instructions on reasonable doubt and burden of proof, while avoiding informing jurors that they are prohibited from engaging in jury nullification. Trial judges must, therefore, be careful

30

when crafting an appropriate response to a particular jury inquiry about nullification to avoid encouraging nullification while also avoiding any misstatements of law.

Finally, we consider whether the appellants have demonstrated prejudice. *See Carter*, *supra*, 236 Md. App. at 475 (explaining that, in the context of erroneous jury instructions, "[t]he complainant bears the burden to show both prejudice and error") (quotation and citation omitted). In this case, we are persuaded that the appellants have demonstrated probable prejudice. After hearing the trial court's Third Nullification Instruction informing the jury that jury nullification is "contrary to law" and would constitute a violation of the court's order, the jury -- which had been previously deadlocked -- soon returned a verdict of guilty for all three appellants.[20] We are persuaded that it is at least probable that a juror who would have otherwise voted to acquit one or more of the appellants on a nullification theory would have changed his or her vote after being informed that nullification was prohibited and would constitute a violation of the court's order. Accordingly, we hold that the trial court's improper jury instructions warrant reversal in this case.

## II.

In order to provide guidance upon retrial, we next address whether the trial court correctly denied Appellant Sayles's motion to suppress two photo array identifications. We first set forth the facts and procedural history of the issue.

---

[20] The jury sent multiple notes informing the trial court of a deadlock or partial deadlock on the second and third days of deliberations.

The State sought to introduce the photographic identifications of Sayles made by victims Aracely Ochoa and David Rivera. Sayles filed a pretrial motion to suppress the identifications on the basis that the photo array was unduly suggestive. He argued that the tattoos on the faces of the other individuals in the array appeared to be doctored and that the tattoos on Sayles's face were the only ones that appeared to be authentic.

During interviews by detectives, Ms. Ochoa and Mr. Rivera both described one of the suspects as having tattoos on his face. At the suppression hearing, Detective Jose Guzman testified that Mr. Rivera described one of the suspects as a "black male, 5'9. Light-skinned, 170 pounds, 26 years of age, tattoo on right cheek, possibly green Irish clover." Ms. Ochoa testified that the suspect had a tattoo on his left cheek and a tattoo dot on the tip of his nose. Sayles has two tattoos on his face, a dot in between his eyes, and a line on his upper left cheek.

Detective Guzman further testified that it was difficult to find mugshots of five other men who matched the description of Sayles given by the victims and also had tattoos on their faces. Detective Guzman stated that he requested assistance from David Roloff, who provides technical support to the Montgomery County Police Department for photographs and downloading videos. Detective Guzman requested that Mr. Roloff alter the photos of the other mugshots to add two tattoos to their faces. Detective Guzman testified that he told Mr. Roloff he wanted the photos in black and white as well. Mr. Roloff altered the photographs of the other individuals in the array to include the same tattoos as Sayles. Detective Guzman testified that he had the tattoos included on the other photographs to resemble the target as closely as possible and that had he not done so, Sayles would have

32

been the only one in the array with tattoos on his face. Black and white copies of the altered photographs, as well the photograph of Sayles, were shown to Ms. Ochoa and Mr. Rivera. Both Ms. Ochoa and Mr. Rivera selected the photograph of Sayles.

Both Ms. Ochoa and Mr. Rivera testified at the suppression hearing. Ms. Ochoa testified that the mole or tattoo between Sayles's eyes, as well as the tattoo on the side of his eyes, led her to pick his photograph. She testified that she selected his photograph because that was the person she identified that was in her house. Mr. Rivera testified that one of the suspects had small tattoos on his face, one between the eyes, one on the cheek, and one on the side of his right eye. He testified that everything about Sayles's photo --his face and physical features -- indicated to him that Sayles was the person in his apartment on the night of the crime.

At the suppression hearing, Sayles argued that it was apparent that the "so-called tattoos" on the other photographs were not real. Additionally, Sayles insisted that "the lighter [the] complexion of the mug shot the more apparent it is that the tattoo is fake." The trial court subsequently denied the motion to suppress on the following basis:

> And then finally, we heard from Detective Guzman who is the lead detective in the case who took descriptions from the witnesses about the persons that had spent the night in their house in this home invasion and that based upon the description of this defendant, which consisted of some fairly distinctive tattoos that he tried to put together the least suggestive photo array he could.
>
> Now obviously he couldn't alter the photo of the defendant and remove the tattoos. But he found other, five other defendants who he thought looked generally similar to this defendant. They didn't have the tattoos or at least tattoos that were as many or in the right locations as the defendant had and so he

33

asked the assistance of a technical person of the police department to alter the photos of the other defendants to add some tattoos which thereby would make the defendant stand out less.

In addition to which the Court notes having looked at the Exhibits he testified that he had the photos shown in black and white as opposed to color and it appears from the Exhibits that if anything the black and white tends to downplay or to reduce the prominence of the tattoos and in addition to which the Court would note that when you actually look at the array, frankly except as [the prosecutor] points out the one prominent tattoo to the extent it's a tattoo that they all appear to have is a dot in the middle of – or between their eyes.

That's prominent in all six. But in so far as other tattoos that they have because of the shadows of the photographs, you know, that fall across the neck, you really can't tell…

In so far as [defense counsel's] observations that clearly some of those have been photoshopped in or are not real, I can't tell that as I look at them. That certainly doesn't stand out to me.

So, under the circumstances it looks to me like the officers did everything—the detective charged with the investigation, Mr. Guzman, Detective Guzman, did everything possible to try to put together the least suggestive photo array that he could under the circumstances. So, I don't find that there was anything unnecessarily suggestive about the array itself.

At trial, Sayles objected when Ms. Ochoa's pre-trial identification was offered into evidence, stating the following:

I'm putting this on the record out of an abundance of caution. We had a motion to suppress the photo array identifications and the in-court identifications. We'd object to both of those, just so the record is clear I don't want to waive any objections by not saying anything at this point.

Sayles did not object a second time when Mr. Rivera's pre-trial identification was offered into evidence.

34

We first reject the State's argument that Sayles's challenge to the denial of his pretrial suppression motion was waived. Indeed, the denial of a motion to suppress is reviewable on appeal pursuant to Rule 4-252(h)(2)(C), regardless of whether the defendant objects to the evidence when it is offered at trial. See *Jackson v. State*, 52 Md. App. 327, 331 (1982).[21] Nevertheless, Sayles objected to both photo arrays when Ms. Ochoa's pre-trial identification was offered at trial.

When reviewing a court's denial of a motion to suppress, "we limit ourselves to considering the record of the suppression hearing." *Small v. State*, 464 Md. 68, 88 (2019). "We accept the suppression hearing court's factual findings and determinations regarding the credibility of testimony unless they are clearly erroneous." *Id.* Moreover, "[w]e review the facts found by the trial court in the light most favorable to the prevailing party." *Wilkes v. State*, 364 Md. 554, 569 (2001). "Legal conclusions are reviewed *de novo.* We independently apply the law to the facts to determine whether a defendant's constitutional rights have been violated. We independently apply the law to the facts to determine whether a defendant's constitutional rights have been violated." *Small*, *supra*, 464 Md. at 88 (internal citations omitted).

"Due process protects the accused against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures." *Id.* at 82-83. This Court employs a two-step inquiry to determine the admissibility of an identification:

---

[21] *Jackson* addressed this issue in the context of the prior Rule 736, which is, in relevant part, identical to the current Rule 4-252(h)(2)(C).

> The first question is whether the identification procedure was impermissibly suggestive. If the procedure is not impermissibly suggestive, then the inquiry ends. If, however, the procedure is determined to be impermissibly suggestive, then the second step is triggered, and the court must determine whether, under the totality of circumstances, the identification was reliable.

*Smiley v. State*, 442 Md. 168, 180 (2015) (internal citations and quotations omitted).

We must first review whether the photo arrays here were impermissibly suggestive. "Suggestiveness can arise during the presentation of a photo array when the manner itself of presenting the array to the witness or the makeup of the array indicates which photograph the witness should identify." *Id.* at 180. Moreover, "[c]oncerns may arise when one individual's photograph is shown to a witness multiple times or somehow stands out from the other photos in the array." *Small*, *supra*, 464 Md. at 89. Sayles argues that the photo array here was suggestive because his photograph is the only photo that appears to have authentic tattoos. Sales asserts that his photo stood out compared to the other photos, which he contends were digitally altered in a manner that was obviously apparent to a viewer.

Sayles relies primarily on *Small*, *supra*, when arguing that the photographic array in this case was impermissibly suggestive. In *Small*, a victim had described his attacker as having a letter "M" tattooed on his neck; the victim was shown a photo array in which the suspect was the only person who had a visible tattoo on his neck. 464 Md. at 91. The Court held that the visible tattoo served to emphasize the suspect's photograph as compared to the other photos, and, in conjunction with the fact that the suspect's photo was the only one repeated in a second photo array, law enforcement impermissibly suggested to the victim that he should identify the suspect's photo. *Id.* Here, Detective Guzman

36

contemplated this very issue and rectified it by adding tattoos to the faces of the other individuals.

Our review of the record leads us to conclude that the trial court's denial of Sayles's motion to suppress was not clearly erroneous. Upon review of the photo arrays, we agree with the trial court's characterization that the tattoos do not appear to be digitally altered in any way. Additionally, the trial judge accurately determined that the black and white coloring of the photographs downplayed the prominence of the tattoos in general. Indeed, there is nothing about the digitally altered photographs that make them stand out from the photograph of Sayles. As such, the alterations do not direct a witness to select Sayles's photograph. We hold, therefore, that the trial court did not err in denying the motion to suppress.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR A NEW TRIAL. COSTS TO BE PAID BY MONTGOMERY COUNTY.**